**HORIZON HOUSE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

National Labor Relations
Board, Petitioner,

v.

Horizon House Developmental Services,
Inc., Respondent.

No. 02–1199, 02–1547.

United States Court of Appeals,
Third Circuit.

Argued Dec. 3, 2002.

Decided Feb. 6, 2003.

Guy Vilim (Argued), Gold and Vilim, Philadelphia, PA, for Horizon House, Inc.

Arthur F. Rosenfeld, John E. Higgins, Jr., John H. Ferguson, Aileen A. Armstrong, Charles Donnelly, John R. McIntyre (Argued), National Labor Relations Board, Washington, DC, for the National Labor Relations Board.

Before ROTH, SMITH and CUDAHY,* Circuit Judges.

OPINION

SMITH, Circuit Judge.

District 1199C of the National Union of Hospital and Health Care Employees, AFSCME, AFL–CIO (hereinafter "the Union") filed charges against Horizon House, Inc., alleging that it violated § 8(a)(1) and (5) of the National Labor Relations Act (hereinafter "the NLRA" or "the Act"). The National Labor Relations Board (hereinafter "the N.L.R.B." or "the Board") filed a complaint on behalf of the Union and subsequently determined that Horizon House violated § 8(a)(1) and (5) of the Act by, *inter alia*, withdrawing its recognition of the Union without a good

* Honorable Richard Cudahy, Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

faith reasonable doubt as to the Union's majority status. Thereafter, Horizon House filed a petition for review, asserting that it had a good faith reasonable doubt. The Board cross-filed a petition for enforcement of its order. We have jurisdiction under 29 U.S.C. § 160(e) and (f). For the reasons set forth below, we will enforce the Board's order and deny Horizon House's petition for review.

## I.

Horizon House operates several social service agencies for individuals with disabilities, including residential sites for some of its clients in the Pennsylvania counties of Philadelphia, Bucks and Delaware. The residential sites are staffed by residential advisors, who are supervised by a home coordinator. The residential advisors in the Bucks County residential sites joined District 1199C in mid–1998. The bargaining unit numbered only 22 to 23 employees. Their initial collective bargaining agreement ("CBA") was effective from December 21, 1998 to September 30, 2000.

During most of 1999, Traci Thompson served as the Union delegate. She resigned from this position in January 2000. During a telephone conversation that month with Rita Kucsan, the director of human resources for Horizon House, Thompson suggested that some employees no longer desired union representation and that they had begun to circulate a petition to that effect, which management would not see until July. Thompson also told Kucsan that the Union was ineffectual and difficult to contact, and that its representation was not worth the dues the membership was required to pay. This conversation led Kucsan to believe that the Union might have lost its majority support.

In April of 2000, Thompson informed Betti Jo Murphy, one of Horizon House's home coordinators, that some employees were preparing a document that would express their desire to discontinue Union representation. Murphy passed this information on to Kucsan. Beginning in May of 2000, management, including Kucsan, met with the company's home coordinators in an effort to determine employee sentiment concerning the Union and "to get a handle from the supervisors [sic] viewpoint about what the employees [sic] experience was in trying to have Union representation."

By letter dated June 8, the Union's president advised Horizon House that the current CBA would expire on September 30 and that it intended to "negotiate a new agreement." The letter requested a meeting with Horizon House's representatives "as soon as possible."

In July, Thompson again spoke negatively about the Union in conversation with Kucsan. Wondering how she could file a complaint against the Union, Thompson said that members were upset because other members were not paying Union dues. At some point, Kucsan supplied Thompson with the N.L.R.B.'s telephone number so that she could pursue this issue. After Thompson contacted the N.L.R.B., she learned that it was the employer's responsibility to collect union dues. Thompson then asked Kucsan for permission to schedule a staff meeting so that the Union could inform its members that a complaint could not be filed against the Union for failure to collect dues because this was the employer's obligation. Kucsan denied the request.

Additional management meetings were held during the summer, and home coordinators Barbara Rossi and Erica Mount advised their superiors that they did not believe that the Union had majority support. Mount based her belief on the fact

that her subordinates declined union representation at disciplinary proceedings, and that two employees had complained about their inability to contact the Union and the Union's insistence that they complete a second membership card. Rossi had also heard a complaint from another employee about the difficulty members had in contacting the Union. Still another employee under Rossi's supervision expressed her belief that the Union was not necessary. Employee Tanisha Moore complained to Rossi that it was unfair that she was paying dues while other bargaining unit members were not.

In a letter dated July 27, Horizon House's counsel advised the Union's president that the Union's assigned negotiator should contact him by telephone to schedule dates for negotiation. His letter, however, failed to provide any available dates to start negotiations.

That same day, the Union requested a list from Horizon House of all of the bargaining unit members working at its facilities. This information was supplied to Maureen Bendig, the Union representative, by facsimile on July 31. Thereafter, on August 9, 2000, Bendig advised Kucsan that there were fourteen full-time employees and two part-time employees who were not in good standing because they had not signed membership cards authorizing the deduction of dues. Bendig requested that Horizon House complete membership cards for the sixteen employees, and provide the Union with a monthly list of all employees. About a week later, Kucsan informed Bendig that Horizon House would deliver the membership cards to union employees this one time, but that the CBA did not obligate Horizon House to distribute and collect the cards.

The Union conducted an open meeting on August 10, 2000. Approximately eight to ten employees attended this meeting, *i.e.*, 36 to 45% of the bargaining unit members. Four employees attended a second union meeting held within the next week, during which Thompson and Ravonne Thomas, another residential advisor, were elected to the negotiating committee. Bendig informed Kucsan of these election results.

On August 11, Bendig submitted a grievance to Robert Lindsey, one of Horizon House's managers, on behalf of an employee who had not yet signed a membership card. Bendig also informed Lindsey that Thompson would serve as the union witness during the investigation of this employee's grievance. In addition, Bendig indicated that a meeting regarding a termination grievance by another employee had been rescheduled.

Bendig requested additional information for the upcoming negotiations in a letter dated August 14. One week later, Bendig submitted several class action grievances, alleging a failure to pay required overtime and a failure to post work schedules. On August 23, Bendig represented Tanisha Moore at a disciplinary proceeding. Following the meeting, Bendig asked Lindsey about her August 14 request for information and a date to commence contract negotiations. Neither the information nor a date were provided.

A week later, on August 30, Bendig served three other class action grievances upon Lindsey, charging that the employer was changing work schedules in violation of the CBA, that supervisors were performing bargaining unit work, and that work schedules were not being posted. In addition to the grievances, Bendig also requested information on the "leave bank policy" provided for in the CBA. In a response letter dated September 6, Kucsan requested specific information about the alleged contract violations. She also indicated that Bendig's August 14 request for

information had been forwarded to Horizon House's counsel. Bendig did not receive any of the requested information prior to expiration of the CBA.

With the September 30 expiration of the contract looming, Bendig pressed for dates for negotiating sessions. She asked Kucsan for dates, but Kucsan only complained of her difficulty in contacting counsel and explained that she would not be speaking with him until the end of the month, just prior to the contract's expiration date. On September 19, Bendig attended another disciplinary proceeding concerning Moore. At the end of this proceeding, Bendig pressed Lindsey this time for a date to start negotiations, but to no avail. A week before the contract expired, Bendig again asked Kucsan for a date to conduct negotiations. Kucsan responded that she had not yet talked to Horizon House's counsel. Although Horizon House never advised the Union that it was refusing to bargain, no dates were ever set for negotiations and no negotiations were conducted prior to September 30, 2000.

On Monday, October 2, 2000, the first business day following the expiration of the contract, Horizon House provided each of its Bucks County bargaining unit members with a memorandum which stated, in relevant part, that:

> [A]s far as we can tell, most of you would rather not have a union at all and are completely happy to be left alone about the issue.

> Because of this, beginning October 2, 2000, Horizon House will try to have the union decertified. We do this because we want each of you to have the right to decide for yourselves, now, if you want to have a union or not. . . .

To give you the opportunity to make that decision, on October 2, 2000, Horizon House will file papers with the National Labor Relations Board to get an election in which you can vote to have a union or not.

By the close of business on October 2, the Union filed a charge against Horizon House alleging that Horizon House had violated § 8(a)(1) and (5) of the NLRA "by failing and refusing to engage in collective bargaining for a new agreement and by refusing to provide information requested by the Union which is relevant and necessary for collective bargaining." The N.L.R.B. filed a complaint on February 23, 2001 and a hearing before an Administrative Law Judge ("ALJ") took place on May 9, 2001.

In its defense, Horizon House claimed that it had a good faith reasonable doubt as to whether the Union still had the support of a majority of the bargaining unit employees. Kucsan explained during her testimony before an Administrative Law Judge that the company's belief that a majority of the bargaining unit workers did not support the Union was based on several factors: the statements of several of the employees, particularly Thompson; the small number of employees authorizing dues to be deducted from their paychecks; the failure of the Union to elect a new delegate to replace Thompson; and the failure by "a significant number" of employees to request union representation at disciplinary proceedings.

After hearing the evidence, the ALJ concluded that Horizon House had a reasonable uncertainty[1] and that it had not

---

1. In *Allentown Mack Sales and Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998), the Supreme Court considered whether an employer had committed an unfair labor practice by withdrawing its recognition from the Union. There, the Court used the terms "good faith reasonable doubt"

engaged in an unfair labor practice by refusing to negotiate for a new collective bargaining agreement. The ALJ explained that he relied principally upon the "firsthand statements by the employees" and did not consider the employer's proffer with respect to employee turnover, failure to appoint a union delegate, or the failure of employees to authorize dues deductions. Based on his finding that Horizon House had a reasonable uncertainty as to the Union's majority status, the ALJ recommended that other unfair labor charges be dismissed.

The N.L.R.B. reversed the ALJ, concluding that he "inaccurately characterized some of the testimony on which he relied" in finding a good faith reasonable doubt. After examining the record, the N.L.R.B. concluded that only two employee statements, Thompson's and DiYenno's, demonstrated anti-union animus. That limited evidence, the Board reasoned, was insufficient to establish a good faith reasonable doubt as to whether the Union had lost its majority status. As a result, it ruled that Horizon House had engaged in an unfair labor practice by withdrawing its recognition of the union. The Board also determined that the employer had engaged in unfair labor practices in violation of the Act by refusing to bargain and by failing to provide information and to process grievances.

Horizon House appeals, arguing that the Board failed to apply the standard set forth by the Supreme Court in *Allentown Mack Sales and Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998), for determining whether an employer had a reasonable uncertainty. Horizon House claims that the N.L.R.B. failed to accord the proper weight to the testimony of Thompson and Murphy with respect to the efforts by several employees

to prepare a decertification petition. In response, the N.L.R.B. has filed a cross-petition for enforcement, contending that its decision is supported by substantial evidence and comports with the standard set forth in *Allentown Mack*.

## II.

The standard of review we apply to the Board's decision and order is a deferential one. Subsections 10(e) and (f) of the NLRA both provide that the "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall ... be conclusive." 29 U.S.C. § 160(e) and (f). Nonetheless, in determining whether there is substantial evidence, we must canvass the entire record and "take into account whatever in the record fairly detracts" from the Board's decision. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York, Inc. v. N.L.R.B.*, 305 U.S. 197, 217, 59 S.Ct. 206, 83 L.Ed. 126 (1938). In other words, there is substantial evidence if it would have been possible, based on the record, for a reasonable jury to reach the Board's conclusion. *Allentown Mack*, 522 U.S. at 367, 118 S.Ct. 818. If there is substantial evidence to support the Board's decision, we should not disturb that decision even though we might "justifiably have made a different choice had the matter been before [us] *de novo.*" *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. 456.

## III.

It is an unfair labor practice, under § 8(a)(5) of the NLRA, for an employer

and "reasonable uncertainty" interchangeably. *Id.* at 361, 364, 467–371, 118 S.Ct. 818.

"to refuse to bargain collectively with the representatives of his employees[.]" 29 U.S.C. § 158(a)(5). A violation of § 8(a)(5) of the NLRA is also a violation of § 8(a)(1) of the Act. *New Jersey Bell Tel. Co. v. N.L.R.B.*, 720 F.2d 789, 791 n. 2 (3d Cir. 1983). In other words, an employer who refuses to collectively bargain with the representatives of its employees derivatively violates § 8(a)(1). *Citizens Publ'g and Printing Co. v. N.L.R.B.*, 263 F.3d 224, 233 (3d Cir.2001); *New Jersey Bell Tel. Co.*, 720 F.2d at 791 n. 2. That section makes it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of their rights" under the NLRA. 29 U.S.C. § 158(a)(1).

Under limited circumstances, however, a refusal to bargain collectively may not constitute an unfair labor practice. As the Supreme Court observed in *Allentown Mack,*

> Under longstanding precedent of the National Labor Relations Board, an employer who believes that an incumbent union no longer enjoys the support of a majority of its employees has three options: to request a formal, Board-supervised election, to withdraw recognition from the union and refuse to bargain, or to conduct an internal poll of employee support for the union. The Board has held that the latter two are unfair labor practices unless the employer can show that it had a "good faith reasonable doubt" about the union's majority support.

522 U.S. at 361, 118 S.Ct. 818.

Usually, a union is "entitled under board precedent to a conclusive presumption of majority status during the term of any collective-bargaining agreement, up to three years." [2] *Auciello Iron Works, Inc. v. N.L.R.B.*, 517 U.S. 781, 786, 116 S.Ct. 1754, 135 L.Ed.2d 64 (1996) (internal quotation marks and citations omitted). This presumption

> address[es] our fickle nature by enabl[ing] a union to concentrate on obtaining and fairly administering a collective bargaining agreement without worrying about the immediate risk of decertification and by remov[ing] any temptation on the part of the employer to *avoid* good faith bargaining in an effort to undermine union support.

*Id.* at 786, 116 S.Ct. 1754 (emphasis added) (internal quotations marks and citations omitted). "[U]pon *expiration* of the collective-bargaining agreement, the presumption of majority status becomes a rebuttable one." *Auciello Iron Works*, 517 U.S. at 786, 116 S.Ct. 1754 (emphasis added). That is, an employer may then legitimately refuse to bargain because the union does not, in fact, enjoy majority status, or because the employer has a good faith doubt with respect to whether the union continues to have majority status.

To demonstrate a good faith reasonable doubt or uncertainty about whether a union enjoys majority support, an employer must adduce more than just his subjective belief. *Allentown Mack*, 522 U.S. at 723 n. 2, 118 S.Ct. 948. There must exist objective evidence supporting a good faith reasonable doubt as to whether a majority of the employees in the bargaining unit favor the union. *Id.* As the *Allentown Mack* Court recognized, "it is not the fact of disfavor

---

**2.** As we explained in *Pick–Mt. Laurel Corp. v. N.L.R.B.*, 625 F.2d 476, 480 (3d Cir.1980), the presumption of majority status during the term of a CBA "stems from a previously enunciated Board rule, the contract-bar rule, which bars an election petition while a contract is in effect for a specified period." Thus, "[a]s a result of the contractbar rule and the presumption of majority status," neither the employer nor the employees may challenge a union's status during the pendency of the contract. *Id.* at 480.

that is at issue ... but rather the existence of a reasonable uncertainty on the part of the employer regarding that fact." 522 U.S. at 370, 118 S.Ct. 818.

## IV.

We conclude that there is substantial evidence to support the Board's determination that Horizon House did not have a good faith reasonable doubt because the evidence on which Horizon House relied was not indicative of the extent of Union support during the weeks and months leading up to the CBA's expiration date. To a great extent, Horizon House relied on statements uttered by Thompson in January and April of 2000 to support its contention that the majority of the bargaining unit members no longer favored the Union. The company submits that it was entitled to accord great weight to these statements under *Allentown Mack* because of Thompson's status as the former Union delegate. Indeed, *Allentown Mack* instructs that an employer may reasonably "give great credence" to a union official's assertion that the union is disfavored because of the fact that that official is in a "good position to assess antiunion sentiment." 522 U.S. at 371, 118 S.Ct. 818. Because Thompson was a former union delegate, her statements, indicating some employee dissatisfaction with the Union, warranted consideration.

Thompson's statements, however, cannot be considered in a vacuum. One such statement was uttered some nine months before the contract expired, and the other, five months before CBA expiration. A review of the entire record, as required by the substantial evidence test, makes it clear that Horizon House's doubt arose in early 2000, and did not take into account subsequent events. Those events demonstrated increasing Union support as the expiration date of the collective bargaining

agreement's three year term approached. These events included: (1) the Union's notice to Horizon House in June that it intended to negotiate a successor agreement; (2) Thompson's request for a staff meeting in July to report that she had learned it was the employer's responsibility to collect union dues and the Union's subsequent request in early August that Horizon House supply union cards to sixteen members of the twenty-two member bargaining unit; (3) the attendance by 36 to 45% of the bargaining unit members at a union meeting held on August 10; (4) the notification by the Union to Kucsan that Thompson and Ravonne Thomas had been elected to the negotiating committee at a second union meeting in mid-August; (5) the notification in early August to Lindsey that Thompson would be serving as the union witness during a disciplinary proceeding for another bargaining unit member; (6) the Union's involvement in several grievances in August and September, and; (7) the filing of several "class action" grievances regarding overtime, the posting and changing of work schedules, and the performance of bargaining unit work by supervisors. Furthermore, the petition from bargaining unit members indicating their desire to decertify the Union, which had been alluded to by Thompson, never materialized. In light of this heightened Union activity and Thompson's apparent recommitment to Union objectives, and in the absence of any petition to oust the Union, it was not reasonable for Horizon House to rely on Thompson's earlier statements as a weather vane of union sentiment during the months leading up to contract expiration. *See Allentown Mack*, 522 U.S. at 368 n. 2, 118 S.Ct. 818 (instructing that an employer's good faith reasonable doubt must be supported by objective evidence).

Horizon House contends that it reasonably relied upon its managers' perceptions

that the bargaining unit members were no longer interested in the Union. It points out that Rossi advised Kucsan that employee Tanisha Moore had complained about the Union. Yet Moore was also a dues paying member who had invoked her right to have union representation at a disciplinary proceeding in August. Indeed, several employees who had not signed union cards invoked their right to union representation during disciplinary proceedings that summer, thereby negating any reasonable belief by Horizon House that those particular employees were antiunion.

As support for its position, Horizon House cites the fact that a majority of the bargaining unit members had not signed membership cards by mid-August and had not authorized the deduction of union dues. We addressed this issue in *Furniture Rentors of America, Inc. v. N.L.R.B.*, 36 F.3d 1240, 1245 (3d Cir.1994), declaring that a "high number of resignations or a low number of dues checkoff authorizations will not without more justify withdrawal of recognition, although they may be considered when assessing majority support for a union." We instructed that the "employer must produce affirmative evidence of dissatisfaction sufficient to ground a good faith doubt of continued majority status." *Id.* In this case, Horizon House has failed to identify any affirmative evidence in August or September, beyond the low number of dues checkoff authorizations, that would support its contention that a majority of the bargaining unit members were antiunion.

That there is a temporal aspect to whether an employer had a good faith reasonable doubt is not novel. The jurisprudence concerning this defense demonstrates that these cases have turned on the circumstances existing at or near the time the employer withdrew its recogni-

tion. For example, in *Allentown Mack* the Supreme Court considered evidence regarding "the period before and immediately after the sale" of a union operation, 522 U.S. at 362, a period from December 1990, when the business was purchased, through mid-January 1991, when the new owner advised that it had a good faith doubt as to the union's majority status. *Id.* Similarly, in *N.L.R.B. v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990), the Supreme Court considered the circumstances from the time the collective bargaining agreement expired in late May until late July when the employer refused to bargain, claiming that the union no longer had the support of the majority. In *N.L.R.B. v. Wallkill Valley Gen. Hosp.*, 866 F.2d 632 (3d Cir.1989), we concluded that the employer did not have a reasonable uncertainty since it relied on events that occurred during a strike approximately a year before the employer withdrew its recognition of the union. Clearly then, an employer contemplating withdrawal of recognition of a union is not free to claim a loss of majority status based on some events which suggest a weakening of union support while ignoring more recent events which show a strengthening of support for the union.

After consideration of the entire record, we conclude that there was substantial evidence for the Board's determination that Horizon House did not have a reasonable uncertainty as to the Union's majority status in the months immediately preceding the expiration of the CBA. Accordingly, we will grant the Board's petition to enforce its order and deny Horizon House's petition for review.