PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MEDIA GENERAL OPERATIONS,
INCORPORATED, d/b/a The Tampa
Tribune,

*Petitioner,*

v.

NATIONAL LABOR RELATIONS
BOARD,

*Respondent.*

No. 08-1153

NATIONAL LABOR RELATIONS
BOARD,

*Petitioner,*

v.

MEDIA GENERAL OPERATIONS,
INCORPORATED, d/b/a The Tampa
Tribune,

*Respondent.*

No. 08-1197

On Petition for Review and Cross-application
for Enforcement of an Order
of the National Labor Relations Board.
(12-CA-24770)

Argued: December 4, 2008

Decided: March 13, 2009

Before KING and DUNCAN, Circuit Judges, and Rebecca Beach SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Petition for review granted; cross-petition for enforcement denied by published opinion. Judge Duncan wrote the majority opinion, in which Judge Smith concurred. Judge King wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Glenn Edward Plosa, ZINSER LAW FIRM, P.C., Nashville, Tennessee, for Media General Operations, Incorporated, d/b/a The Tampa Tribune. Fred B. Jacob, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the National Labor Relations Board. **ON BRIEF:** L. Michael Zinser, ZINSER LAW FIRM, P.C., Nashville, Tennessee, for Media General Operations, Incorporated, d/b/a The Tampa Tribune. Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Jill A. Griffin, Supervisory Attorney, William M. Bernstein, Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the National Labor Relations Board.

---

## OPINION

DUNCAN, Circuit Judge:

The Tampa Tribune ("the Tribune") appeals from a judgment of the National Labor Relations Board ("the Board") that it violated the National Labor Relations Act ("the Act")

when it fired employee Gregg McMillen for making derogatory remarks about the Tribune's Company Vice President. The administrative law judge ("ALJ") found that McMillen's dismissal was lawful because his statement was so profane and offensive that it was not protected by the Act. On review, the Board reversed the ALJ's decision. The Tribune petitioned this court for review; and the NLRB brought a cross-petition for enforcement of the Board's decision. We find that the Board erred as a matter of law concluding that the law protects McMillen's use of profanity regarding his employer, which was directed to his supervisors, during work hours and in the work place, in a conversation McMillen initiated regarding an undisputedly accurate and legal letter he had admittedly never read, and the setting of which was physically and temporally removed from the site of the ongoing collective bargaining negotiations. We therefore reverse its decision and reinstate the decision of the ALJ.

I.

A.

The National Labor Relations Act, 29 U.S.C. §§ 151-69, ensures that employees are not discriminated against for engaging in collective action in the workplace. Its provisions protect the rights of employees to organize and engage in collective bargaining and associated activities. 29 U.S.C. § 157. Its protections prevent employers from retaliating against their workers for undertaking "concerted activities" and provide a process for enforcement of the rights guaranteed by the Act. 29 U.S.C. §§ 157, 160.

After Gregg McMillen was fired from his job as a journeyman pressman at the Tribune, he individually filed charges with the General Counsel of the Board, claiming that his dismissal contravened the Act's protections. The charging statement issued by the General Counsel alleged two violations of the Act: (1) a violation of section 8(a)(1) for not allowing

McMillen to be accompanied by a union representative at his disciplinary meeting, 29 U.S.C. § 158(a)(1); and (2) a violation of sections 8(a)(1) and 8(a)(3) for terminating McMillen as a result of protected concerted activities, 29 U.S.C. § 158(a)(1), (3).

The facts of this case as found by ALJ are not disputed, and contrary to the dissent's characterization, we take them as true. Gregg McMillen was a pressman for *The Tampa Tribune*, a daily newspaper published by Media General Operations, Inc. d/b/a The Tampa Tribune ("the Tribune").[1] On October 31, 2004, the contract between the Tribune and the Graphic Communications Conference of the International Brotherhood of Teamsters, Local 180 ("the Union") expired. McMillen belonged to the Union, which represented the pressroom employees of the Tribune, and was covered by the expired contract.

Following the expiration of the previous agreement, the Tribune and the Union began the process of renegotiating their contract. The negotiations were rancorous and were ongoing at the time of the events that led to McMillen's dismissal in November 2005.

During these negotiations, Bill Barker, Company Vice President of the Tribune, sent a series of letters to the pressroom workers describing what was occurring from his perspective. Significantly for purposes of our decision, there is no dispute in this case that the letters were *legal and accurate*. However, many of the pressmen took exception to them, and McMillen was among roughly 25 signatories to a letter sent to Barker on November 4, 2005 that protested Barker's letter-writing and characterization of the negotiations. On November 9, Barker wrote to the employees in response to their letter

---

[1]Hereinafter references to "the Tribune" will be to the publisher unless otherwise noted.

of November 4, again expressing his view that the Union was the major source of delay in the process.

On the night of November 10, 2005, McMillen arrived for his third-shift job at the press. During that shift, he went into the office that is located in the pressroom. Two supervisors— Glenn Lerro, the pressroom foreman, and Joel Bridges, the assistant foreman— were the only other people in the office. While there, McMillen stated in response to a question about how he was doing that he was "stressed out" as a result of the latest letter from Barker. Lerro asked if McMillen had seen the latest letter, and McMillen replied that he had not. Lerro informed him that it was likely a response to the employees' letter of November 4. McMillen then said: "I hope that fucking idiot [Barker] doesn't send me another letter. I'm pretty stressed, and if there is another letter you might not see me. I might be out on stress." J.A. at 372.

Lerro and Bridges made no response to the statement at the time, but the following morning Lerro did send an email to George Kerr, the pressroom manager, informing him of McMillen's statement. Barker and George Stewart, the production director, were copied on the email. Lerro also asked Bridges to send Kerr an email relating his version of the events, which Bridges did.

McMillen failed to show up for his next shift, which was scheduled on November 11. He claimed this absence was due to the sleeping pill he was forced to take to calm down after reading Barker's letter following his arrival home on November 10. As a result of the missed shift, McMillen was informed that he would be suspended from two shifts without pay. When he returned to work on November 13, he signed the resulting disciplinary report and added an editorial comment to the effect that it was Barker's "lieing [sic] discrimination, harassing and threatening letters" which caused him to miss his shift. J.A. at 373. At that time, he also told Lerro he

was sorry if any of his remarks on November 10 were inappropriate, reiterating that that Barker "gets to [him]." *Id.*

Meanwhile, Kerr, George, and Barker met to discuss the report of the incident that they had received from Lerro. As a result of McMillen's statement, the Tribune's management decided to fire him for a violation of Pressroom Office Rule 9.[2] When he arrived at the Tribune on November 16, McMillen was escorted into Stewart's office to meet with Stewart, Kerr, and Rick Serra, the Tribune's Human Resources Manager. Donald Hale, another Tribune pressman, attempted to accompany McMillen into the office but was told that the meeting was not for the purpose of an investigation and so McMillen had no right to union representation. Kerr stated that he had been informed that McMillen had referred to Barker in derogatory terms; McMillen interrupted the comment to acknowledge having made the statement.[3] Kerr then informed McMillen that he was fired, and McMillen was subsequently escorted from the building.

## B.

The case was first heard by ALJ Joel Biblowitz. Following a full hearing and fact-finding, the ALJ dismissed both charges against the Tribune. The ALJ concluded that McMil-

---

[2]The Pressroom Office Rules make violation of any rule an offense punishable by "disciplinary actions, up to, and including termination." Rule 9 bars, among other things, the use of "[t]hreatening, abusive, or harassing language . . . disorderly conduct . . . and all disturbances interfering with employees at work anywhere in the building." J.A. at 373.

[3]The ALJ found that McMillen made this admission in an unprompted response to a statement by Kerr and not in response to a question. Because the decision had already been made to terminate McMillen before the meeting began and because Kerr did not question McMillen about his statement, the ALJ concluded and the Board agreed that McMillen had no right to union representation at the meeting and that the Tribune therefore did not violate section 8(a)(1) of the Act with respect to the denial of representation. J.A. at 379-80, 394. This holding is not challenged on appeal.

len had no entitlement to representation and therefore that there was no violation of his right to representation. In analyzing whether McMillen's dismissal was wrongful, the ALJ concluded that McMillen was engaged in concerted activity at the time of his statement but that his statement was so "profane, offensive and personally denigrating" as to be unprotected by the Act. J.A. at 383.

The General Counsel entered exceptions to the ALJ's decision. On appeal, the Board upheld the ALJ's decision as to the first charge but reversed the ruling on the second, finding that McMillen's dismissal violated the Act. J.A. at 397. The Tribune filed a petition for review with the Fourth Circuit and the Board brought a cross-appeal for enforcement of the Board's decision.

## II.

The Tribune appeals the decision of the Board through Media General Inc., the parent company of *The Tampa Tribune*. Media General is incorporated in the Commonwealth of Virginia and transacts business in this circuit. We therefore have jurisdiction over the petition for review and cross-petition for enforcement pursuant to §§ 29 U.S.C. 160(e) and (f).

On appeal, the Tribune contends that the Board impermissibly overturned credibility determinations of the ALJ; that McMillen was not engaged in a concerted activity protected by the Act when he made the derogatory statement about Barker; and that even if the activity in question were protected, the Board misapplied its precedent in finding that McMillen's statement was not so egregious as to lose the Act's protection. We address each of these arguments in turn below.

Legal determinations by the Board must be upheld by a reviewing court if they are "rational and consistent with the

Act." *Media General Operations, Inc. v. NLRB*, 394 F.3d 207, 211 (4th Cir. 2007). However, the reviewing court has a responsibility to correct any errors of law that are made by the Board in reaching its conclusions. *Id.* Mixed questions of law and fact are reviewed under a substantial evidence standard "where the Board's legal interpretations are otherwise valid." *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 210 (4th Cir 2005).

A.

The Tribune argues that the Board impermissibly overturned credibility findings of the ALJ in reaching its decision. Specifically, the Tribune contends that the ALJ's finding that McMillen's derogatory statement about Barker was the reason for his firing is a credibility determination that should be insulated from the Board on review. Appellant's Br. at 41-42 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951), for the proposition that the Board owes considerable deference to the ALJ on findings of fact because the latter has "heard the evidence and seen the witnesses"). The Tribune's argument on this point is misguided.

The determination of the nature of the outburst is not properly a "credibility determination" made by the ALJ but a legal conclusion based upon the Board's inferences from facts in the record. The ALJ made clear in his opinion the points at which he was making credibility determinations. *See, e.g.*, J.A. at 379. But his analysis of the application of the law to the fact he found does not qualify as a credibility determination. Therefore, the ALJ's determination is not entitled to any special deference by the Board. The Board was not constrained by the ALJ's findings in determining whether McMillen's conduct had and retained the protection of the Act and was free to find, subject to review by this court, that it did.

## B.

The Tribune also contends that McMillen was not engaged in protected concerted activity when he made his derogatory statement about Barker. The ALJ found and the Board affirmed that McMillen's conduct was concerted activity within the meaning of the Act because "it was part of an ongoing collective dialogue between Barker and the unit employees about the substance and process of the contract negotiations." J.A. at 395. Specifically pointing to the letters that were exchanged between Barker and the pressroom employees, the Board found that McMillen's derogatory statement was "a logical outgrowth of the prior collective and concerted activity." *Id.* (internal quotation marks omitted) (citing *Every Woman's Place*, 282 N.L.R.B. 413 (1986)).

While we do not find that this conclusion is wrong as a matter of law, we do note that the conduct in question skirts the outer bounds of that which can be considered concerted activity under the Act's auspices. McMillen's derogatory comment was part of a conversation he individually initiated; it was not temporally associated with the actual negotiations in question or the actions that prompted it; and it could not have been directly responsive to the Tribune's negotiating positions, since McMillen prefaced the remark by stating that he had not yet read Barker's letter. *Cf. Stanford N.Y., LLC*, 344 N.L.R.B. 558, 559 (2005) (spontaneous outburst in direct response to discussion about union activities); *Trus Joist Macmillan*, 341 N.L.R.B. 369, 369-70 (2004) (employee requested meeting specifically to discuss an illegal firing). Nevertheless, we decline in this case to overturn the finding that McMillen's conversation concerning Barker and Barker's letters was entitled to the Act's protection in the first instance. This does not, however, settle the inquiry about whether McMillen retained the Act's protection when he launched an ad hominem attack against his supervisor.

## C.

Even concerted actions that are assumed to be protected by the Act may forfeit such protection if they are "egregious or flagrant." *Care Initiatives, Inc.*, 321 N.L.R.B. 144, 151 (1996) (quoting *Coors Container Co. v. NLRB*, 628 F.2d 1283, 1288 (10th Cir. 1980)). The Tribune contends, and the ALJ found, that even if McMillen's statement was made in the context of concerted activity, he forfeited the protection of the Act because he engaged in "vulgar, profane, and obscene language directed at . . . [an] employer," *Care Initiatives*, 321 N.L.R.B. at 151, in responding to his employer's legal acts. We agree.

The test for whether an employee has forfeited the protection of the Act as a result of the nature of his conduct was set forth by the Board in its decision in *Atlantic Steel Co.*, 245 N.L.R.B. 814 (1979). There, the Board held that a reviewing body must balance four factors to determine whether the Act's protection applies: "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice." *Id.* at 816. If the balance is such that the conduct crosses the line from "protected activity . . . [to] opprobrious conduct," the worker loses the protection of the Act. *Id.*

In the instant case, the ALJ found and the Board agreed that the first two factors weighed in favor of McMillen retaining the Act's protections. J.A. at 396. The discussion during which the derogatory remark was made took place away from the pressroom floor in an office that was used by pressroom supervisors and thus was at least semi-private.[4] In addition,

---

[4]In balancing the *Atlantic Steel* factors, the Board has in general found that remarks made in private are less disruptive to workplace discipline than those that occur in front of fellow employees. *See, e.g.*, *Stanford N.Y.*, 344 N.L.R.B. at 558 (finding that "[t]he relatively secluded room and . . .

McMillen's comment occurred in the context of a discussion of Barker's letters, and those letters dealt with the ongoing contract negotiations between the Tribune and the Union. The Board also agreed with the ALJ that the fourth factor militated against extending the protection of the Act, since McMillen never claimed that he was responding to an unfair labor practice. Instead, his outburst was in response to a series of admittedly legal and truthful letters written by Barker. J.A. at 383, 396.

Where the two adjudicators parted ways was on the significance of the third factor. The ALJ determined that the nature of the outburst was "so egregious" that it removed McMillen's statement from the Act's protection. J.A. at 381. The Board disagreed. Analyzing the record, it found that the nature of the remark was only moderately prejudicial to McMillen's retention of the Act's protection. The Board based this determination on the fact that the remark was not made directly to Barker, that it was an isolated statement for which McMillen later apologized, and that it was neither a direct challenge to Barker's authority nor did it undermine employee discipline. J.A. at 396. Because of this different weighting of the third factor, the Board overturned the ALJ's conclusion and found that on the balance of the factors McMillen was entitled to the protection of the Act. J.A. at 396-97.

---

[the employee's] efforts to maintain the privacy of the conversation weighs in favor of [the Act's] protection"). We note, however, that when a discussion is instigated for the express purpose of making vulgar remarks, the privacy of the location may factor into the balance differently. *Compare id.*, *with Trus Joist Macmillan*, 341 N.L.R.B. at 370 (noting that while "[i]n one respect the [private] locus of . . . [the] outburst was one that would have a less disruptive effect than it would have if it had occurred on the plant floor[,] . . . . in another respect, the locus accentuated and exacerbated the insubordinate nature of . . . [the employee's] offensive outbursts" because the employee's purpose in requesting a meeting was to "embarrass" his supervisor in front of management).

We disagree. The Board overreached as a matter of law in finding that the conduct in question was not so egregious as to forfeit the protection of the Act. The dissent accuses us of engaging in de novo fact-finding to arrive at this conclusion. *See infra* at 16-17. It is, however, tellingly unable to point to a single instance in which such fact-finding occurs despite progressively more expansive rhetoric. It does not and cannot dispute, for instance, that McMillen had never read Barker's November 9 letter or that McMillen's comment concerning Barker was made in a meeting he initiated during an ordinary shift and not physically or temporally connected to the site of the ongoing labor negotiations.[5] The dissent's repeated (and heated) mischaracterization of our opinion attempts to mask the fact that what it actually disputes is our *interpretation* of the facts and the legal conclusions of the Board. Our opinion today finds that the Board erred as a matter of law—which is precisely the sort of review we, as a circuit court, are required to conduct.

The lack of concurrence between Barker's lawful letter and McMillen's comment particularly disfavors protection. This was not a spontaneous outburst in response to an illegal threat but an ad hominem attack made in the context of a discussion McMillen initiated with two supervisors. It was a response to an undisputedly legal letter issued in exercise of the company's rights. In addition, McMillen had not even read the letter in question, which further divorces his derogatory remark from the context of the ongoing labor dispute and thus makes the remark of a nature less eligible for protection. *See Trus Joist Macmillan*, 341 N.L.R.B. at 371 (no protection for "offensive outburst [that] was not a spontaneous or reflexive reaction"). "[I]nsulting, obscene personal attacks by an employee against a supervisor need not be tolerated," even

---

[5]We note, in passing, that in its recitation of the "facts" that we "find," the dissent also makes the same analytical mistake of which it accuses us: namely, it conflates facts concerning whether or not an individual is engaged in concerted activity with those concerning whether or not a particular statement maintains the protection of the Act.

when they occur during otherwise protected activity. *Care Initiatives*, 321 N.L.R.B. at 151 (internal punctuation omitted) (quoting *Caterpillar Tractor Co.*, 276 N.L.R.B. 1323, 1326 (1985).

It is also of particular significance, as we have noted, that McMillen made his derogatory remark in response to a series of *lawful* letters sent by his employer. Thus, the fourth factor of the *Atlantic Steel* test weighs more than slightly against extending the Act's protection. *See* J.A. at 396. The lawfulness of the employer's actions also distinguishes this case from others in which the Board has extended much greater latitude to employees who are reacting to patently unlawful actions by their employers. *See Care Initiatives*, 321 N.L.R.B. at 152 ("[A]n employer may not rely on employee conduct that it has unlawfully provoked as a basis for disciplining an employee." (quoting *NLRB v. Sw. Bell Tel. Co.*, 694 F.2d 974, 978 (5th Cir. 1982))); *see also Stanford N.Y.*, 344 N.L.R.B. at 559 (brief profanity was protected where it was a "direct and temporally immediate response" to unlawful threats by a supervisor). *Compare Severance Tool Indus., Inc.*, 301 N.L.R.B. 1166, 1170 (1991) (holding that, notwithstanding his "disrespectful, rude, and defiant demeanor and the use of a vulgar word," an employee was not denied the protection of the Act where such actions were a direct response to threats made against unionized employees by the supervisor to whom the disrespect was shown), *with Fibracan Corp.*, 259 N.L.R.B. 161, 161 (1981) (upholding the dismissal of a worker for "repeated and blatant use of profanity" toward her supervisor where it was used in response to an inquiry about prior profanity, not in response to the employer's illegal suspension of workers following a lawful walkout).

The Board has "expressly disavowed any rule whereby otherwise protected activity 'would shield any obscene insubordination short of physical violence'" from legal disciplinary action. *Felix Indus. v. NLRB*, 251 F.3d 1051, 1055 (D.C. Cir. 2001) (quoting *Atlantic Steel*, 245 N.L.R.B. at 817). The bal-

ancing test set forth by the Board in *Atlantic Steel* recognizes that "in the heat of discussion" employees may use strong language that would be wholly inappropriate in other contexts where there is greater leisure for reflection. 245 N.L.R.B. at 816. The Act's protections are not limitless, however, and where they do not reach, employers cannot be compelled to tolerate language or behavior that undermines workplace discipline. *Trus Joist Macmillan*, 341 N.L.R.B. at 371 ("Employers and employees have a shared interest in maintaining order in the workplace, an order that is made possible by maintaining a certain level of decorum."); *cf. Felix Indus.*, 251 F.3d at 1054-55 (explaining that words alone can be sufficiently violative of these concerns so as to lose the protection of the Act). It was not a remark made in the heat of negotiation—or even in direct response to Barker's legal communications, for McMillen had not even read the latest letter. We do not disparage the importance of the protections provided for employee speech by the Act. But in this case, McMillen's opprobrious ad hominem attack on a supervisor made at a point temporally remove from and concerned only with lawful behavior by the employer falls outside the zone of protection.

### III.

Because of the inexplicably hyperbolic tenor of the dissent, we think it useful to reiterate the confines of our decision. Characterized accurately, it is far from the ukase the dissent apparently believes it to be.

We do not, for instance, say, as the dissent suggests, that employee conduct is protected only at the physical site of labor negotiations. Nor do we define the parameters of an employee's protected response to illegal conduct by his or her employer. Those cases are simply not before us.

Rather, we base our decision in this case on the totality of the *undisputed facts as found by the ALJ*. On that basis, we

hold that there is no protection for McMillen's profane remark regarding his employer, which was directed to his supervisors, during work hours and in the work place, occurred in a conversation McMillen himself initiated regarding an accurate and legal letter he had never read, and the setting of which was physically and temporally removed from the site of ongoing collective bargaining negotiations.

The Board did not, in this case, merely apply the law as it existed. Rather, it expanded the *Atlantic Steel* factors to essentially create a buffer around employee conduct that would travel with the employee wherever he goes and for as long as some form of collective bargaining can be said to be taking place. That ruling would significantly expand the parameters of our extant law, pushing its borders beyond the language of the Act. The principles of *Atlantic Steel* remain valid and provide important protections for employees. In this case, however, McMillen's action in response to the legal expression of his employer simply is of such a nature that it forfeits those protections.

## IV.

For the reasons set forth above, we reach the conclusion that the Board erred as a matter of law in finding McMillen's conduct protected by the Act. We therefore reverse the judgment of the Board and reinstate the opinion of ALJ Biblowitz. As a result, we deny the cross-petition for enforcement of the Board's decision.

*PETITION FOR REVIEW GRANTED;*
*CROSS-PETITION FOR ENFORCEMENT DENIED*

KING, Circuit Judge, dissenting:

The panel majority has today overruled the Board and denied legal protection to an employee's one-time use of profane language concerning a supervisor — referring to him as

a "stupid fucking moron" — in a private setting during intense labor negotiations. Unfortunately, my colleagues have misconstrued the facts and failed to accord the Board the considerable deference it is due under the law. *See NLRB v. Truck Drivers Union*, 353 U.S. 87, 96 (1957) ("[T]he function of striking [a] balance [between the conflicting interests of employers and employees] to effectuate national labor policy is often a difficult and delicate responsibility which Congress committed primarily to the [Board], subject to limited judicial review.").[1]

In enforcement proceedings such as this, we are always obliged to defer to the Board "where it has chosen 'between two fairly conflicting views, even [if we] would justifiably have made a different choice had the matter been before [us] de novo.'" *Smithfield Packing Co. v. NLRB*, 510 F.3d 507, 515 (4th Cir. 2007) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). We have recognized that the Board's legal rulings are entitled to deference when they are "rational and consistent" with the Act. *NLRB v. Air Contact Transp., Inc.*, 403 F.3d 206, 210 (4th Cir. 2005). Importantly, the Board's findings on factual issues are conclusive if they are supported by "substantial evidence on the record considered as a whole." *Indus. Turnaround Corp. v. NLRB*, 115 F.3d 248, 251 (4th Cir. 1997); *see also NLRB v. Southland Mfg. Co.*, 201 F.2d 244, 245 (4th Cir. 1952) (recognizing that Board's legitimately drawn conclusion in discharge proceeding is "binding upon the courts" because courts "are without power to find facts or to substitute their judgment for that of the Board" (internal quotation marks omitted)).

---

[1]Indeed, the Supreme Court has long recognized the considerable deference we must accord the Board. *See, e.g.*, *Auciello Iron Works v. NLRB*, 517 U.S. 781, 787-88 (1996) (concluding that reviewing courts must give "considerable deference" to the Board "by virtue of its charge to develop national labor policy" (internal quotation marks and citations omitted)); *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 691 (1980) (observing that "we accord great respect to the expertise of the Board when its conclusions are . . . consistent with the Act").

Put simply, the panel majority today has embarked on an unjustifiable reach — making de novo findings and conclusions in this case — and substituted its judgment for a decision reserved by law to the Board. I strongly disagree and therefore dissent.

I.

As an initial matter, the panel majority's recitation of the relevant facts fails to capture the appropriate picture of the labor negotiations underlying this enforcement proceeding. Thus, the majority fails to place in proper perspective McMillen's one-time reference to Vice President Barker as a "stupid fucking moron." When the collective bargaining agreement ("CBA") between the Tribune and the Union expired on October 31, 2004, the parties began negotiating on a new labor contract. Between December 2004 and November 2005, Barker prepared and distributed a series of letters to the Tribune's employees, describing the contract negotiations from the company's point of view. The contents and tone of those communications are crucial to assessing the propriety of McMillen's single challenged comment, and to deciding whether the Board's ruling that he could not legally be terminated is entitled to considerable deference:

- Barker's first letter, dated December 28, 2004, asserted that the negotiations could have been completed in one day at the first bargaining session and blamed the lack of an agreement on the Union representative;

- The second letter, dated June 2, 2005, asserted that, during the negotiations, the Union representative had called Barker a "fucking idiot" and had threatened a strike and boycott. *Media Gen. Operations, Inc.*, No. 12-CA-24770, slip op. at 2 (N.L.R.B. Feb. 22, 2007) (the "ALJ Decision").

Barker then stated that it appeared the parties would be negotiating for a long time;

- The third letter, dated September 1, 2005, alleged "unprofessional behavior" by the Union during the June meeting, and spoke of "consequences that [the employees] might face as a result of this behavior." ALJ Decision 2;

- The fourth letter, dated September 30, 2005, referred to labor negotiations on September 26 and 27, criticizing the Union's behavior and expressing concern about the slow pace of such negotiations; and

- The fifth letter, dated November 1, 2005, discussed proposed bargaining dates. Barker criticized the Union representative's lack of availability on certain dates and stated, "We at least hope that, in the future, the Union will respond more promptly." ALJ Decision 3.

Not unexpectedly, the Union employees reacted angrily to the letters' antiunion slant. In response, on November 4, 2005, twenty-five pressroom Union employees prepared their own letter, criticizing Barker and the Tribune's bargaining posture. The employees' letter observed that Barker sat in a "nice clean, quiet office, chat[ting] with people in business suits" and "go[ing] out to lunch," while the Union employees "work in noise so loud we need hearing protection, breath [sic] chemical fumes and ink mist, handle hazardous . . . chemicals" and "are not allowed to leave the premises for lunch." ALJ Decision 3. The Union employees pointed out that there was no carpet on the floor nor pictures on the walls, and the equipment with which the employees work "can strip the flesh off our bones and mangle us." *Id.* Finally, they urged Barker to sign the Union proposal and "help us feel confident our

management team is as thankful for our efforts as you say and write." *Id.*

Barker's sixth and final letter, dated November 9, 2005, was written in response to the Union employees' letter. Barker wrote that he appreciated the employees' work and realized their frustration, and the Tribune would be "as patient as necessary to get a good [CBA]" and was "going to persevere." ALJ Decision 3-4. Barker asserted that third parties interfere with "collective as well as individual successes," and added that, under the Union structure, the Company could not individually negotiate with employees or a subgroup of employees "as long as [they had] a third party representative." *Id.* at 4.

McMillen was by no means a passive observer to the labor negotiations regarding a new CBA. He had received Barker's first five letters and, on several occasions after receiving and reading them, spoke with his foremen and voiced dissatisfaction with Barker. He also voiced his dismay in conversations with fellow employee Donald Hale, who shared a negative opinion of the letters.[2] Not surprisingly, McMillen was one of the twenty-five Union employees who signed the November 4 letter protesting the Company's bargaining posture.

On November 10, 2005, while working the evening shift, McMillen first learned from another employee that Barker had sent his final November 9 letter. During a lull at work, he went to the pressroom office and spoke with his shift foremen, Lerro and Bridges. When Bridges asked McMillen how he was doing, McMillen complained about the slow pace of the labor negotiations and about the letters Barker had been sending. McMillen said, "I am a little stressed out. I heard we got another letter from Bill Barker." ALJ Decision 4. McMil-

---

[2]Fellow employee Donald Hale testified that McMillen "got pissed off getting those letters . . . . He didn't like them. I got one too, and I didn't like mine either." ALJ Decision 4.

len admitted he had not read Barker's latest letter, but Lerro told him it was probably a response to the employees' letter. McMillen then opined it was not right for Barker to be "harassing" and "threatening" the workers by sending letters. *Id.* He added, in reference to Barker, "I hope that [stupid] fucking [moron] doesn't send me another letter. I'm pretty stressed, and if there is another letter you might not see me. I might be out on stress." *Id.*[3] As a result, Lerro sent an email to pressroom manager Kerr the following morning, reporting the incident and describing McMillen as "very upset and literally shaking." *Id.* at 5.

After missing work the next day, McMillen signed a disciplinary record documenting his absence. He continued to voice his displeasure with the labor negotiations by writing on the record,

> If [Barker] would quit writing me lieing discrimination, harassing and treatening letters through the U.S. MAIL I wouldn't have to take sleeping pills to go to sleep. Thank you Tampa Tribune for not careing about are well being.

ALJ Decision 5 (misspellings in original). McMillen thereafter apologized to foreman Lerro if anything he had said on November 10 was inappropriate, and said "you know Bill gets to me." *Id.* at 5. When pressroom manager Kerr spoke to McMillen on November 16, McMillen, without being asked, admitted to the outburst and was immediately terminated from his employment with the Tribune.

This picture — which we are obliged to accept as the rele-

---

[3]Although McMillen testified that he said "fucking idiot," other testimony was that he said "stupid fucking moron." *See* ALJ Decision 5, 7-8. The Board found no legally relevant difference between the two versions of his statement, but used the words "stupid fucking moron" in its decision.

vant factual background of this case — shows that, at the time of McMillen's comment, intense labor negotiations were ongoing with the Company, and the Union employees were upset about the progress of those negotiations and the letters written by Barker. Assessing McMillen's comment in that context, the Board ruled that the Tribune had violated the Act by terminating McMillen for making the comment, and it therefore ordered his reinstatement as a Tribune employee. *See Media Gen. Operations, Inc.*, 351 N.L.R.B. No. 96, slip op. at 4-5 (Dec. 28, 2007) (the "Board Decision"). That ruling should not — under controlling precedent — be disturbed by a reviewing court.

## II.

### A.

The Supreme Court has long recognized that the Act does not protect all concerted activities. For example, the Act does not protect activities that are unlawful, violent, or in breach of contract. *NLRB v. Wash. Aluminum Co.*, 370 U.S. 9, 17 (1962).[4] In the context of labor negotiations, however, employees are generally entitled to use "accusatory language" that is "stinging and harsh," or even display "a certain amount of salty language or defiance." *CKS Tool & Eng'g*, 332 N.L.R.B. 1578, 1586 (2000); *Am. Tel. Co. v. NLRB*, 521 F.2d 1159, 1161 (2d Cir. 1975). Such broad protection is a reflection of the fact of industrial life that, during labor disputes, "[b]oth labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." *Linn v. United Plant Guard Workers*, 383 U.S. 53, 58 (1966); *see*

---

[4]The Supreme Court has also recognized an exception for "disloyalty against an employer." *NLRB v. Local Union No. 1229, Int'l Bhd. of Elec. Workers*, 346 U.S. 464, 472 (1953). However, McMillen's comment is a far reach from the "disloyalty" exhibited in *International Brotherhood*, where employees, while still on the payroll, launched a handbill campaign to undermine the quality of the company's television broadcasts. *Id.* at 467-69 & n.4.

*also Consol. Diesel Co. v. NLRB*, 263 F.3d 345, 354 (4th Cir. 2001) (recognizing that "[t]here would be nothing left of [the Act's] rights if every time employees exercised them in a way that was somehow offensive to someone," they were subject to the threat of discipline).

Of course, as the panel majority points out, "the Act's protections are not limitless, . . . and where they do not reach, employers cannot be compelled to tolerate language or behavior that undermines workplace discipline." *Ante* at 14. The Board recognized as much in its *Atlantic Steel Co.* decision, laying out four factors to be reviewed and balanced to determine if employee conduct is protected by the Act: "(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice." 245 N.L.R.B. 814, 816 (1979).[5]

Here, the Board recognized that McMillen's comment constituted a "profane and derogatory" statement, but also recognized that "employees are permitted some leeway for impulsive behavior when engaged in a concerted activity." Board Decision 2-3. In applying the *Atlantic Steel* test, the Board concluded that factors one and two weigh "moderately to strongly" in favor of protection for McMillen's comment under the Act. *Id.* at 4. The Board explained, on factor one,

---

[5]*Atlantic Steel* establishes the Board's seminal test for determining whether an employee who has engaged in concerted activity can, by opprobrious conduct, lose the Act's protection. *See, e.g.*, *Beverly Health and Rehab. Servs.*, 346 N.L.R.B. 1319, 1322 (2006); *Waste Mgmt. of Ariz., Inc.*, 345 N.L.R.B. 1339, 1340, 1353-54 (2005) ("Where profane and other offensive conduct occurs in the context of a protected concerted activity that potentially removes the conduct from the protection of the Act, the *Atlantic Steel* test is used."). At least one other circuit has utilized the test. *See Felix Indus. v. NLRB*, 251 F.3d 1051, 1053-54 (D.C. Cir. 2001). We agree with the majority and the Board that *Atlantic Steel* supplies the proper legal test for this analysis.

that "the discussion occurred in an office, away from any other rank-and-file employees, and thus could not have affected workplace discipline or undermined Barker's authority." *Id.* at 3. With respect to factor two, the Board observed that

> the subject matter was McMillen's criticism of the [Tribune's] bargaining tactics and positions, as well as Barker's repeatedly sending employees letters perceived to be one-sided, involving issues that many pressmen had similarly commented on both critically and collectively. McMillen's expression of his opinion on these topics is a fundamental [right under the Act].

*Id.*

Although the Board further concluded that factor three of *Atlantic Steel* should weigh against the Act's protection, the Board specified that "the nature of McMillen's remark weighs only moderately against his retaining the Act's protection." Board Decision 3. In so ruling, the Board relied on several pertinent aspects of this dispute: (1) the McMillen comment was *about* Barker, but was not directed *at* him; (2) there were no other confrontational aspects, such as physical conduct or threats; (3) McMillen made his comment only once, promptly and spontaneously apologized for it, and, on his own initiative, sought to explain himself; (4) the comment was not insubordinate in regard to production or work assignments; and (5) the comment did not serve to directly challenge Barker's managerial authority. *See id.* Finally, the Board also concluded that *Atlantic Steel*'s factor four should weigh against the Act's protection — but only "slightly" so, even less than factor three — because McMillen's comment was "provoked by Barker's letters, which were lawful communications." *Id.*

In making its ultimate assessment of the McMillen comment under the *Atlantic Steel* test, the Board closed with the

following analysis and conclusion, which we owe consider-
able deference:

> We find that the location and subject matter of
> McMillen's statements, which weigh moderately to
> strongly in favor of retaining the Act's protection,
> more than offset the nature of his outburst and the
> lack of provocation by unfair labor practices of the
> [Tribune], which weigh slightly to moderately
> against protection. *Thus, . . . we find that McMillen's
> statements on November 10 retained the protection
> of the Act despite his profane and derogatory remark
> about Barker.*

Board Decision 4 (emphasis added).

The Board — the labor experts to whom we must defer —
struck an appropriate balance in this dispute, and its conclu-
sion was both rational and consistent with applicable prece-
dent. *Cf., e.g.*, *Felix Indus., Inc.*, 339 N.L.R.B. 195, 196-97
(2005) (concluding that although "nature of [employee's] out-
burst must be given considerable weight towards losing the
Act's protection, this one factor is insufficient to overcome
the other [two] factors weighing against" loss of such protec-
tion, i.e., that outburst occurred during discussion of employ-
ee's CBA rights and in response to employer's provocative
and hostile remarks about employee's protected activity).
Indeed, McMillen's comment is readily distinguishable from
those more egregious cases where an employee might lose the
protection of the Act. For example, the Board's precedent
shows that an employee should only lose the Act's protection
in serious situations, such as threatening in-your-face confron-
tations, or occurrences in working areas with other employees
present, thereby disrupting the work environment. *See Waste
Mgmt. of Ariz.*, 345 N.L.R.B. 1339, 1340, 1353-54 (2005)
(finding no protection under Act, even though discussion con-
cerned possible unfair wage alterations, where employee
engaged in unprovoked tirade, cursed repeatedly and loudly

before witnesses, refused supervisor's request to move discussion into office, and made threats toward supervisor); *DaimlerChrysler Corp.*, 344 N.L.R.B. 1324, 1328-30 (2005) (finding no protection, though discussion concerned scheduling of grievance meeting, where employee cursed repeatedly in front of many other employees, called supervisor "asshole" to his face, physically approached supervisor in "intimidating" manner, and was not provoked by any unlawful conduct on part of employer); *N. Am. Refractories Co.*, 331 N.L.R.B. 1640, 1642-43 (2000) (finding no protection, though employee was engaged in protected activity, where employee angrily approached supervisor and called him "stupid mother fucker" in front of ten other employees).

## B.

Notwithstanding the deference that we are mandated to afford the Board, the panel majority "find[s] that the Board erred as a matter of law" in concluding that the Act protects McMillen's comment, "which was directed to his supervisors, during work hours and in the work place, in a conversation McMillen initiated regarding an undisputedly accurate and legal letter he had admittedly never read," and which was made in a "setting . . . physically and temporally removed from the site of the ongoing collective bargaining negotiations." *Ante* at 3. In so ruling, the majority improperly substitutes its judgment for that of the Board on the assessment and balancing of at least three of the four *Atlantic Steel* factors, and it disregards facts relied on by the Board in favor of its own de novo findings.[6]

---

[6]The panel majority also seems to undertake an indirect challenge to the Board's determination that McMillen was, on the occasion of his comment, engaged in concerted activity. *See* Board Decision 2. Although the majority "do[es] not find that [the Board's concerted activity] conclusion is wrong as a matter of law," it admonishes that "the conduct in question skirts the outer bounds of that which can be considered concerted activity under the Act's auspices." *Ante* at 9. Notably, the facts the majority cites

### 1.

Even accepting the panel majority's version of the facts, its conclusion that the Board misapplied the *Atlantic Steel* test cannot withstand the slightest scrutiny. First of all, the majority explicitly rejects the Board's assessment of *Atlantic Steel*'s factor four — whether McMillen's comment was, in any way, provoked by the Tribune's unfair labor practice — which the Board deemed to weigh against the Act's protection (albeit only "slightly" so), because McMillen's comment was "provoked by Barker's letters, which were lawful communications." Board Decision 3. The majority concludes that, because "McMillen made his derogatory remark in response to a series of *lawful* letters sent by his employer," the Board should have weighed factor four "more than slightly against extending the Act's protection." *Ante* at 13. The majority cites no apposite authority, however, for its conclusion that employee conduct in response to legal employer activity *must* weigh "more than slightly" against protection. Rather, the majority invokes inapposite Board decisions weighing factor four in favor of the Act's protection because the employee conduct in question was provoked by illegal employer activity. Significantly, the majority ignores precedent reflecting that, even where the employee responded to legal employer activity, the Board can indeed account for the nature of the

---

in support of such a dubious proposition — that "McMillen's derogatory comment was part of a conversation he individually initiated; it was not temporally associated with the actual negotiations in question or the actions that prompted it; and it could not have been directly responsive to the Tribune's negotiating positions, since McMillen prefaced the remark by stating that he had not yet read Barker's letter," *id.* at 9 — are many of the same facts conjured up by the majority in rejecting the Board's analysis of the *Atlantic Steel* factors. *See, e.g.*, *id.* at 12 (asserting that McMillen's comment was "divorce[d] . . . from the context of the ongoing labor dispute" and "lack[ed] . . . concurrence" with Barker's final letter). In any event, the majority declines to disturb the Board's concerted activity determination — and rightfully so, in view of the solid legal and factual ground on which it stands.

employer activity in assessing factor four. *Cf. Overnite Transp. Co.*, 343 N.L.R.B. 1431, 1437-38 (2004) (concluding that factor four weighed in favor of Act's protection where employer's "hostile refusal" to discuss circumstances of employee discharges, although potentially lawful, provoked employee conduct); *Felix Indus.*, 339 N.L.R.B. at 196-97 (weighing factor four in favor of protection where employer's "extremely hostile remarks" about employee's protected activities, though not alleged to be unfair labor practice, provoked employee conduct).[7]

With further respect to *Atlantic Steel*'s factor four, the panel majority asserts a "lack of concurrence between Barker's lawful letter and McMillen's comment," deeming the comment to be "an ad hominem attack" — in contrast to "a spontaneous outburst" — "temporally removed from the site of the ongoing collective bargaining negotiations." *Ante* at 3, 12. The majority also emphasizes that McMillen did not read Barker's final letter, and concludes that this fact "further divorces his derogatory remark from the context of the ongoing labor dispute." *Id.* at 12. In concluding that this factual scenario "makes the remark of a nature less eligible for protection," the majority relies on a wholly distinguishable Board decision: *Trus Joist MacMillan*, 341 N.L.R.B. 369, 371-72 (2004) (concluding that, although employee's outburst was

---

[7]The Board recognized in *Felix Indus.* that it is "free, under *Atlantic Steel*, to consider [employer] conduct that would have been found to be an unfair labor practice had it been so alleged." 339 N.L.R.B. at 196 n.5. Here, the Board did not suggest that Barker's letters constituted an unalleged unfair labor practice. Nevertheless, a majority of the Board observed that Barker's letters' "provocative effect on a prounion employee is neither unexpected nor unreasonable," and that "McMillen may reasonably have been provoked partly by Barker's repeated hints that the pressmen should decertify the Union." Board Decision 3 n.15. Accordingly, the Board majority recognized that "Barker's statements tend to mitigate the egregiousness of McMillen's outburst, although to a lesser degree than had Barker's comments been litigated and found to be legally proscribed." *Id.*

provoked by unfair labor practice, factor four did not favor Act's protection because employee "deliberately launched into a vituperative personal attack" during "confrontational, face-to-face meeting" orchestrated by him three days after employer's illegal activity). *Ante* at 12. In any event, even if factor four is given greater weight against protection than the "slight[]" weight deemed appropriate by the Board, McMillen is yet entitled to protection from termination, on the basis of the Board's assessment of the other three *Atlantic Steel* factors — by which it weighed factors one and two "moderately to strongly" in favor of the Act's protection, and factor three "moderately" against such protection. Board Decision 3-4.

Of course, the panel majority also seems to reject the Board's analysis of at least two other *Atlantic Steel* factors (factors one and three). The majority's analysis of these factors, however, is just as problematic and unconvincing as its assessment of factor four. For example, the majority suggests that factor one, i.e., the place of the discussion, should weigh against the Act's protection because McMillen's comment was made in a "setting . . . physically . . . removed from the site of the ongoing collective bargaining negotiations." *Ante* at 3; *see also id.* at 15 (criticizing Board Decision for "expand[ing] the *Atlantic Steel* factors to essentially create a buffer around employee conduct that would travel with the employee wherever he goes"). The majority thereby indicates that, although it was permissible for Barker to send his letters to the union employees' homes, the employees were not entitled to discuss those letters outside formal CBA negotiations. The majority's apparent view — that only employee conduct occurring at the physical site of labor negotiations should be accorded protection — is not only grossly unfair, but also completely at odds with precedent. That is, the typical factor one assessment focuses on whether the employee conduct, because of the place where it occurred, somehow undermined workplace discipline. *See, e.g.*, *DaimlerChrysler*, 344 N.L.R.B. at 1329 (concluding that factor one weighed against protection in light of place where outburst occurred, in that

employee's "sustained profanity would reasonably tend to affect workplace discipline by undermining the authority of the supervisor subject to his vituperative attack"). Here, the majority does not — and cannot — identify anything in this record supportive of the notion that McMillen's comment undermined workplace discipline. To the contrary, Lerro's email to pressroom manager Kerr reporting McMillen's comment did not even recommend disciplinary action against McMillen; he sent the email because he thought it was proper "to let [Kerr] know of any incidents that happen." Board Decision 2. Significantly, McMillen's comment was a "private remark," *id.* at 3, made to men with whom he frequently spoke about the letters and the labor negotiations. *Cf. Stanford N.Y.*, 344 N.L.R.B. 558, 558 (2005) ("The relatively secluded room and [the employee's] efforts to maintain the privacy of the conversation minimized the potential that [the employee's] outburst would impair [the employer's] ability to maintain discipline in the workplace.").[8]

The panel majority further suggests that factor three — the nature of the employee's outburst — should be given more than the "moderate[]" weight against protection assigned to it by the Board. Board Decision 3. More specifically, the majority invokes the Board's decision in *Care Initiatives, Inc.*, which observed that "insulting, obscene personal attacks by an employee against a supervisor need not be tolerated," even where such attacks were made during protected activity. 321 N.L.R.B. 144, 151 (1996) (internal quotation marks and alterations omitted). The *Care Initiatives* decision emphasized, however, that "care must be exercised in evaluating employee language uttered in the course of engaging in activity pro-

---

[8]The panel majority commendably acknowledges that "the Board has in general found that remarks made in private are less disruptive to workplace discipline than those that occur in front of fellow employees." *Ante* at 10 n.4. Nevertheless, it then injects that, when conversations are "instigated for the express purpose of making vulgar remarks," the situation is vastly different. *Id.* This legal proposition, however, simply has no application or relevance to the underlying facts of this proceeding.

tected by . . . the Act," and that an employee's exercise of rights under the Act "must not be stifled by the threat of liability for the over enthusiastic use of rhetoric." *Id.* (internal quotation marks omitted). Strikingly, the Board observed in *Care Initiatives* that "it has been held that calling an employer's president a 'son-of-a-bitch' was not 'so outrageous as to justify discharge.'" *Id.* at 152 (quoting *NLRB v. Cement Transp., Inc.*, 490 F.2d 1024, 1029-30 (6th Cir. 1974)). In light of this and other precedent, it was entirely rational and consistent with the Act for the Board to rule that McMillen's comment should weigh only moderately against the Act's protection. Indeed, McMillen's comment was less like outbursts that have been denied protection, *see, e.g.*, *DaimlerChrysler*, 344 N.L.R.B. at 1328-29 (concluding that factor three weighed against protection for employee who, in intimidating manner, called supervisor "asshole" to his face and used other profanity, in "more than a single spontaneous outburst," including "bullshit" and "fuck this shit"), and more like outbursts that have been deemed not to weigh against protection at all, *see, e.g.*, *Alcoa, Inc.*, 352 N.L.R.B. No. 141, 2008 WL 4056272 (N.L.R.B. Aug. 29, 2008) (concluding that factor three did not weigh against protection for employee who referred to supervisor, across meeting table, as "egotistical fucker," because employee's "conduct consisted of a single verbal outburst of profane language" that "was simply a forceful and momentary expression of his frustration").

In these circumstances, the Board has neither expanded the *Atlantic Steel* factors nor the "parameters of our extant law," as the panel majority contends. *Ante* at 15. The Board's disposition of this dispute was well within the parameters of its legal authority and binding precedent, and it is instead the panel majority that has reached beyond its bounds.

2.

Finally, the panel majority asserts that it has not made any de novo findings in overruling the Board decision, and that it

has accorded appropriate deference to the Board's findings on the underlying facts. To the contrary, multiple findings of the majority were neither made nor contemplated by the Board, and many of the majority's findings flagrantly contradict those of the Board. For example:

- According to the majority, there was a "lack of concurrence" between Barker's final letter and McMillen's comment. *Ante* at 12. To the contrary, the Board found that McMillen's comment was "directly motivated" by Barker's final letter and a "logical outgrowth" of McMillen's membership in "the group of employees protesting Barker's letters and the positions expressed in them." Board Decision 2.

- According to the majority, that McMillen had not read Barker's final letter before he made the comment "further divorces his derogatory remark from the context of the ongoing labor dispute." *Ante* at 12. To the contrary, the Board directly addressed this point and found that the fact that McMillen had not read the letter when he made his comment "does not prevent us from concluding that McMillen's criticism of this letter was concerted activity," especially in view of the fact that McMillen's comment came in response to foreman Lerro's remark about the likely content of the letter. Board Decision 2 n.9.

- According to the majority, McMillen's comment was "temporally removed from the site of the ongoing collective bargaining negotiations." *Ante* at 3. To the contrary, the Board found that McMillen's conversation with foremen Lerro and Bridges, when the comment was made, "was part of an ongoing collective dialogue between Barker and the unit employees about the substance and

process of the contract negotiations." Board Decision 2; *see also* ALJ Decision 13 ("McMillen was raising issues with Lerro and Bridges that were shared by the Union and his co-workers — their resentment toward Barker's letters about the negotiations, as well as the slow progress of the negotiations.").

• According to the majority, McMillen launched an "ad hominem attack" against Barker. *Ante* at 12. Although the Board recognized McMillen's comment as "intemperate," "profane," and "derogatory," it never suggested that he made the comment to launch a personal attack on Barker. Board Decision 2, 3. Rather, the Board characterized McMillen's comment as an "ill-tempered rejoinder[]" to Barker's positions on the contract negotiations and his choice to air those views in his letters to the employees. *Id.* at 4.

In the context of all this, I am reminded of our founding father John Adams, who successfully argued on behalf of the British soldiers charged in the Boston Massacre more than two centuries ago. President-to-be Adams emphasized the time-honored proposition that "[f]acts are stubborn things . . . and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence." David McCullough, *John Adams* 52 (Simon & Schuster 2001).

III.

Pursuant to the foregoing, this is not a close case and we should readily defer to the Board Decision. I respectfully dissent, therefore, from the majority's surprising decision to substitute its judgment for that of the Board.