## AUCIELLO IRON WORKS, INC. *v.* NATIONAL LABOR RELATIONS BOARD

No. 95–668.   Argued April 22, 1996—Decided June 3, 1996

SOUTER, J., delivered the opinion for a unanimous Court.

*John D. O'Reilly III* argued the cause and filed a brief for petitioner.

*Richard H. Seamon* argued the cause for respondent. With him on the brief were *Solicitor General Days, Deputy Solicitor General Wallace, Linda Sher, Norton J. Come,* and *John Emad Arbab.**

JUSTICE SOUTER delivered the opinion of the Court.

The question here is whether an employer may disavow a collective-bargaining agreement because of a good-faith

---

*\*Jonathan Hiatt, Marsha Berzon, David Silberman,* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

doubt about a union's majority status at the time the contract was made, when the doubt arises from facts known to the employer before its contract offer had been accepted by the union. We hold that the National Labor Relations Board (NLRB or Board) reasonably concluded that an employer challenging an agreement under these circumstances commits an unfair labor practice in violation of §§ 8(a)(1) and (5) of the National Labor Relations Act (NLRA or Act), 49 Stat. 452, 453, as amended, 29 U. S. C. §§ 158(a)(1) and (5).

## I

Petitioner Auciello Iron Works of Hudson, Massachusetts, had 23 production and maintenance employees during the period in question. After a union election in 1977, the NLRB certified Shopmen's Local No. 501, a/w International Association of Bridge, Structural, and Ornamental Iron Workers, AFL–CIO (Union), as the collective-bargaining representative of Auciello's employees. Over the following years, the company and the Union were able to negotiate a series of collective-bargaining agreements, one of which expired on September 25, 1988. Negotiations for a new one were unsuccessful throughout September and October 1988, however, and when Auciello and the Union had not made a new contract by October 14, 1988, the employees went on strike. Negotiations continued, nonetheless, and, on November 17, 1988, Auciello presented the Union with a complete contract proposal. On November 18, 1988, the picketing stopped, and nine days later, on a Sunday evening, the Union telegraphed its acceptance of the outstanding offer. The very next day, however, Auciello told the Union that it doubted that a majority of the bargaining unit's employees supported the Union, and for that reason disavowed the collective-bargaining agreement and denied it had any duty to continue negotiating. Auciello traced its doubt to knowledge acquired before the Union accepted the contract offer, including the facts that 9 employees had crossed the picket

line, that 13 employees had given it signed forms indicating their resignation from the Union, and that 16 had expressed dissatisfaction with the Union.

In January 1989, the Board's General Counsel issued an administrative complaint charging Auciello with violation of §§ 8(a)(1) and (5) of the NLRA.[1] An Administrative Law Judge found that a contract existed between the parties and that Auciello's withdrawal from it violated the Act. 303 N. L. R. B. 562 (1991). The Board affirmed the Administrative Law Judge's decision[2]; it treated Auciello's claim of

---

[1] Section 8(a) of the NLRA provides:

"It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.          .          .          .          .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U. S. C. § 158(a).

Section 7 of the Act provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title." 29 U. S. C. § 157.

[2] The Board has developed a number of criteria to assess whether a collective-bargaining contract has been formed, see, *e. g.*, *Appalachian Shale Products Co.*, 121 N. L. R. B. 1160 (1958), which may not always coincide with those that would govern in the general area of contract law, see *Ben Franklin Nat. Bank*, 278 N. L. R. B. 986, 993–994 (1986). We accept for purposes of deciding this case the Board's conclusion that a contract was formed here within the meaning of the Act. Our review of this case is thus limited to the narrow question whether an employer may withdraw from a collective-bargaining contract once formed when it possessed enough evidence to assert a good-faith doubt about the union's majority status at the time of formation.

Auciello has suggested that the contract itself was invalid *ab initio* because the Union in fact lacked majority support at the time of accept-

good-faith doubt as irrelevant and ordered Auciello to reduce the collective-bargaining agreement to a formal written instrument. *Ibid.* But when the Board applied to the Court of Appeals for the First Circuit for enforcement of its order, the Court of Appeals declined on the ground that the Board had not adequately explained its refusal to consider Auciello's defense of good-faith doubt about the Union's majority status. 980 F. 2d 804 (1992). On remand, the Board issued a supplemental opinion to justify its position, 317 N. L. R. B. 364 (1995), and the Court of Appeals thereafter enforced the order as resting on a "policy choice [both] . . . reasonable and . . . quite persuasive." 60 F. 3d 24, 27 (1995). We granted certiorari, 516 U. S. 1086 (1996), and now affirm.

## II

### A

The object of the National Labor Relations Act is industrial peace and stability, fostered by collective-bargaining agreements providing for the orderly resolution of labor disputes between workers and employees. See 29 U. S. C. § 141(b); *Fall River Dyeing & Finishing Corp.* v. *NLRB,* 482 U. S. 27, 38 (1987) *(Fall River Dyeing).* To such ends, the Board has adopted various presumptions about the existence of majority support for a union within a bargaining unit, the

---

ance. Because the substantiation required to make this showing is greater than that required to assert a good-faith doubt, see *NLRB* v. *Curtin Matheson Scientific, Inc.,* 494 U. S. 775, 788, n. 8 (1990), the Board has not taken a position on whether such a claim could excuse an employer's decision to repudiate an otherwise valid contract and disavow its duty to bargain with the union. Brief for Respondent 26, n. 7. Auciello concedes that it failed to advance this claim in its answer to the General Counsel's complaint, Tr. of Oral Arg. 6, 28, the Board never considered this question, and Auciello sought certiorari review only of the question whether an employer is bound by a union's acceptance in this context when "the Employer had a reasonable basis for a good faith doubt." Pet. for Cert. i. Accordingly, we conclude that this question is not properly before us and decline to address it.

precondition for service as its exclusive representative. Cf. *id.,* at 37–39. The first two are conclusive presumptions. A union "usually is entitled to a conclusive presumption of majority status for one year following" Board certification as such a representative. *Id.,* at 37. A union is likewise entitled under Board precedent to a conclusive[3] presumption of majority status during the term of any collective-bargaining agreement, up to three years. See *NLRB* v. *Burns Int'l Security Services, Inc.,* 406 U. S. 272, 290, n. 12 (1972); see generally R. Gorman, Basic Text on Labor Law: Unionization and Collective Bargaining § 9, pp. 54–59 (1976). "These presumptions are based not so much on an absolute certainty that the union's majority status will not erode," *Fall River Dyeing,* 482 U. S., at 38, as on the need to achieve "stability in collective-bargaining relationships." *Ibid.* (internal quotation marks omitted). They address our fickle nature by "enabl[ing] a union to concentrate on obtaining and fairly administering a collective-bargaining agreement" without worrying about the immediate risk of decertification and by "remov[ing] any temptation on the part of the employer to avoid good-faith bargaining" in an effort to undermine union support. *Ibid.*

There is a third presumption, though not a conclusive one. At the end of the certification year or upon expiration of the collective-bargaining agreement, the presumption of majority status becomes a rebuttable one. See *NLRB* v. *Curtin Matheson Scientific, Inc.,* 494 U. S. 775, 778 (1990); see n. 6, *infra.* Then, an employer may overcome the presumption (when, for example, defending against an unfair labor practice charge) "by showing that, at the time of [its] refusal to bargain, either (1) the union did not *in fact* enjoy majority

---

[3] This presumption may be overcome only in unusual circumstances, see, *e. g., Brooks* v. *NLRB,* 348 U. S. 96, 98–99 (1954) (union dissolution, *inter alia*); 3 T. Kheel, Labor Law § 13A.04[5], p. 13A–26 (1995); R. Gorman, Basic Text on Labor Law: Unionization and Collective Bargaining § 9, pp. 56–57 (1976), none of which is present here.

support, or (2) the employer had a 'good-faith' doubt, founded on a sufficient objective basis, of the union's majority support." *Curtin Matheson, supra,* at 778 (emphasis in original).[4] Auciello asks this Court to hold that it may raise the latter defense even after a collective-bargaining contract period has apparently begun to run upon a union's acceptance of an employer's outstanding offer.

## B

The same need for repose that first prompted the Board to adopt the rule presuming the union's majority status during the term of a collective-bargaining agreement also led the Board to rule out an exception for the benefit of an employer with doubts arising from facts antedating the contract. The Board said that such an exception would allow an employer to control the timing of its assertion of good-faith doubt and thus to "'sit' on that doubt and . . . raise it after the offer is accepted." 317 N. L. R. B., at 370. The Board thought that the risks associated with giving employers such "unilatera[l] control [over] a vital part of the collective-bargaining process," *ibid.,* would undermine the stability of the collective-bargaining relationship, *id.,* at 374, and thus outweigh any benefit that might in theory follow from vindicating a doubt that ultimately proved to be sound.

The Board's judgment in the matter is entitled to prevail. To affirm its rule of decision in this case, indeed, there is no need to invoke the full measure of the "considerable defer-

---

[4] Auciello maintains that *Curtin Matheson* requires reversal here since it appears that the employer in that case asserted its good-faith doubt after the union's acceptance of the contract offer. Brief for Petitioner 19–21. But the case is not authority on the issue of timing. The question presented was whether the Board "in evaluating an employer's claim that it had a reasonable basis for doubting a union's majority support, *must* presume that striker replacements oppose the union." *Curtin Matheson,* 494 U. S., at 777 (emphasis in original). We did not discuss or consider whether the timing of the employer's assertion should affect the outcome of that case, and the decision does not answer that question.

ence" that the Board is due, *NLRB* v. *Curtin Matheson Scientific, Inc.*, *supra*, at 786, by virtue of its charge to develop national labor policy, *Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 500–501 (1978), through interstitial rulemaking that is "rational and consistent with the Act," *Curtin Matheson*, *supra*, at 787.

It might be tempting to think that Auciello's doubt was expressed so soon after the apparent contract formation that little would be lost by vindicating that doubt and wiping the contractual slate clean, if in fact the company can make a convincing case for the doubt it claims. On this view, the loss of repose would be slight. But if doubts about the union's majority status would justify repudiating a contract one day after its ostensible formation, why should the same doubt not serve as well a year into the contract's term? Auciello implicitly agrees on the need to provide some cutoff, but argues that the limit should be expressed as a "reasonable time" to repudiate the contract. Brief for Petitioner 26–32. That is, it seeks case-by-case determinations of the appropriate time for asserting a good-faith doubt in place of the Board's bright-line rule cutting off the opportunity at the moment of apparent contract formation. Auciello's desire is natural, but its argument fails to point up anything unreasonable in the Board's position.

The Board's approach generally allows companies an adequate chance to act on their preacceptance doubts before contract formation, just as Auciello could have acted effectively under the Board's rule in this case. Auciello knew that the picket line had been crossed and that a number of its employees had expressed dissatisfaction with the Union at least nine days before the contract's acceptance, and all of the resignation forms Auciello received were dated at least five days before the acceptance date. During the week preceding the apparent formation of the contract, Auciello had at least three alternatives to doing nothing. It could have withdrawn the outstanding offer and then, like its employ-

ees, petitioned for a representation election. See 29 U. S. C. § 159(c)(1)(A)(ii) (employee petitions); § 159(c)(1)(B) (employer petitions); *NLRB* v. *Financial Institution Employees*, 475 U. S. 192, 198 (1986).[5] "[I]f the Board determines, after investigation and hearing, that a question of representation exists, it directs an election by secret ballot and certifies the result." *Ibid.* Following withdrawal, it could also have refused to bargain further on the basis of its good-faith doubt, leaving it to the Union to charge an unfair labor practice, against which it could defend on the basis of the doubt. Cf. *Curtin Matheson*, 494 U. S., at 778. And, of course, it could have withdrawn its offer to allow it time to investigate while it continued to fulfill its duty to bargain in good faith with the Union. The company thus had generous opportunities to avoid the presumption before the moment of acceptance.

There may, to be sure, be cases where the opportunity requires prompt action,[6] but labor negotiators are not the least nimble, and the Board could reasonably have thought the price of making more time for the sluggish was too high, since it would encourage bad-faith bargaining. As Auciello would have it, any employer with genuine doubt about a union's hold on its employees would be invited to go right on bargaining, with the prospect of locking in a favorable contract that it could, if it wished, then challenge. Here, for example, if Auciello had acted before the Union's telegram by withdrawing its offer and declining further negotiation based on its doubt (or petitioning for decertification), flames would have been fanned, and if it ultimately had been obliged

---

[5] We assume, without deciding, that the withdrawal of an offer under these circumstances could not serve as a basis for the filing of an unfair labor practice complaint, which might trigger the "blocking charge" rule that the NLRB concedes would be implicated by an employer's unlawful withdrawal of recognition. See Brief for Respondent 31, n. 10.

[6] We note that in the unusual circumstance in which evidence leading the employer to harbor such a doubt arises at the same time the union accepts the offer, the Board has agreed to examine such occurrences on a case-by-case basis. 317 N. L. R. B. 364, 374–375 (1995).

to bargain further, a favorable agreement would have been more difficult to obtain. But by saving its challenge until after a contract had apparently been formed, it could not end up with a worse agreement than the one it had. The Board could reasonably say that giving employers some flexibility in raising their scruples would not be worth skewing bargaining relationships by such one-sided leverage, and the fact that any collective-bargaining agreement might be vulnerable to such a postformation challenge would hardly serve the Act's goal of achieving industrial peace by promoting stable collective-bargaining relationships. Cf. *Fall River Dyeing*, 482 U. S., at 38–39; *Franks Bros. Co.* v. *NLRB*, 321 U. S. 702, 705 (1944).

Nor do we find anything compelling in Auciello's contention that its employees' statutory right "to bargain collectively through representatives of their own choosing" and to refrain from doing so, 29 U. S. C. § 157, compels us to reject the Board's position. Although we take seriously the Act's command to respect "the free choice of employees" as well as to "promot[e] stability in collective-bargaining relationships," *Fall River Dyeing, supra,* at 38 (internal quotation marks omitted), we have rejected the position that employers may refuse to bargain whenever presented with evidence that their employees no longer support their certified union. "To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to [industrial peace], it is inimical to it." *Brooks* v. *NLRB*, 348 U. S. 96, 103 (1954). The Board is accordingly entitled to suspicion when faced with an employer's benevolence as its workers' champion against their certified union, which is subject to a decertification petition from the workers if they want to file one. There is nothing unreasonable in giving a short leash to the employer as vindicator of its employees' organizational freedom.

## C

Merits aside, Auciello also claims that the precedent of *Garment Workers* v. *NLRB*, 366 U. S. 731 (1961), compels reversal, but it does not. In *Garment Workers*, we held that a bona fide but mistaken belief in a union's majority status cannot support an employer's agreement purporting to recognize a union newly organized but as yet uncertified. We upheld the Board's rule out of concern that an employer and a union could make a deal giving the union " 'a marked advantage over any other [union] in securing the adherence of employees,'" *id.*, at 738 (quoting *NLRB* v. *Pennsylvania Greyhound Lines, Inc.*, 303 U. S. 261, 267 (1938)), thereby distorting the process by which employees elect the bargaining agent of their choice. 366 U. S., at 738–739. Here, in contrast, the Union continued to enjoy a rebuttable presumption of majority support, and the bargaining unit employees had ample opportunity to initiate decertification of the Union but apparently chose not to do so. With entire consistency, the Board may deny employers the power gained from recognizing a union, even when it flows from a good-faith but mistaken belief in a newly organized union's majority status, and at the same time deny them the power to disturb collective-bargaining agreements based on a doubt (without more) that its employees' bargaining agent has retained majority status. Good-faith belief can neither force a union's precipitate recognition nor destroy a recognized union's contracting authority after the fact by intentional delay. There is, indeed, a symmetry in the two positions.

\* \* \*

We hold that the Board reasonably found an employer's precontractual, good-faith doubt inadequate to support an exception to the conclusive presumption arising at the moment a collective-bargaining contract offer has been ac-

cepted.    We accordingly affirm the judgment of the Court of Appeals for the First Circuit.

*It is so ordered.*