**AMERICAN PROTECTIVE SERVICES, INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AMERICAN PROTECTIVE SERVICES, INCORPORATED, Respondent.**

Nos. 96–1786, 96–1934.

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1997.

Decided May 14, 1997.

son, Baltimore, MD, for Petitioner. Julie Brock Broido, National Labor Relations Board, Washington, DC, for Respondent. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Margaret Gaines Neigus, Supervisory Attorney, National Labor Relations Board, Washington, DC, for Respondent.

Before LUTTIG and WILLIAMS, Circuit Judges, and DUFFY, United States District Judge for the District of South Carolina, sitting by designation.

Reversed by published opinion. Judge LUTTIG wrote the opinion, in which Judges WILLIAMS and DUFFY joined.

## OPINION

LUTTIG, Circuit Judge:

The National Labor Relations Board held that petitioner American Protective Services, Inc. unlawfully withdrew its final offer for a collective bargaining agreement prior to acceptance by the Union, because the withdrawal repudiated an agreed-upon ratification procedure and because the withdrawal came at a time when the Union's vote on ratification was complete. For the reasons that follow, we reverse and deny enforcement of the Board's order.

### I.

In August of 1992, American Protective Services ("the Company") and the International Union of Security Officers ("the Union") began collective bargaining over successor agreements for five units of employees for which collective bargaining agreements either had expired or were soon going to expire. The Union declined to accept the Company's "last, best and final" offers for each of the five units, although it agreed to submit the offers to the employees for votes, with a recommendation that the employees reject the offers. For purposes of this litigation, the Company and the Union stipulated that "[i]t was understood by the parties that, if the employees ratified the agreements, in accordance with the Union's ratification pro-

**ARGUED:** Warren Malcolm Davison, Littler, Mendelson, Fastiff, Tichy & Mathia-

cedures, they would enter into a binding contract(s)." J.A. at 47.

After the Union's initial mailing of ratification ballots to the employees, the Union discovered that a significant number of employees had not received ballots. J.A. at 38–39. Even after extending the deadline for receipt of ballots, the Union continued to have problems with the voting. Therefore, the Union's vice president, Robert Ulreich, requested the assistance of the Company. The Company, although not obligated to do so, agreed to provide mailing labels for all of the employees in the five units and to assist in mailing out the ballots if the Union would agree to certain conditions, including that the ballots would be counted by a state or federal mediator and that they would be counted no later than December 7. The Union agreed to these terms and the parties jointly sent out the ballots on or about November 25.

On Friday, December 4, Stan Ohman, an employee in unit 3, filed a decertification petition to decertify the Union as the collective-bargaining representative for unit 3. The petition stated that there were approximately 200 employees in unit 3 and that the petition was signed by the requisite 30 percent or more of that unit's employees. Therefore, the Board's Regional Office docketed the decertification petition.[1] Also on December 4, Ohman personally delivered a copy of the decertification petition to Thomas Sutak, the Company's chief negotiator.

In response, the Company sent a letter that same day to Union Vice President Ulr-

eich notifying him that the Company was withdrawing its offer for unit 3 but would make a new proposal within ten days. Also that same day, the Company notified the mediator of its withdrawal of the offer and requested that the mediator not count the ratification ballots for unit 3.[2] The Company sent a letter to its unit 3 employees stating that "we must rethink our offers and the nature of our union agreements in light of our employees' very strong negative feelings about union representation." J.A. at 40. The parties have stipulated that there is no evidence to dispute the Company's assertion that it withdrew its offer "solely based" on the Company's desire to "reexamine" the offer in light of the decertification movement and to "consider" withdrawing the union-security and dues-checkoff provisions of the offer. J.A. at 40. Since the December 4 withdrawal of the offer, the Union has consistently refused the Company's invitation to meet for the purpose of presenting a new proposal for unit 3. J.A. at 40. Instead, the Union filed this unfair labor practice charge against the Company under section 8(a)(5) and (1) of the National Labor Relations Act, charging that the Company "engaged in bad-faith bargaining by withdrawing tentative offers without demonstration of a good reason for doing so." J.A. at 40.[3]

The ALJ dismissed the complaint in its entirety, finding that, in light of the decertification movement, it was reasonable for the Company to withdraw its contract offer for the purpose of "considering" whether to

---

**1.** On December 14, the Board's Regional Office notified Ohman that his petition included an insufficient number of signatures because there were, in fact, approximately 500 to 600 employees in unit 3, rather than approximately 200 employees as Ohman stated in his decertification petition. The Regional Office gave Ohman until December 18 to obtain the requisite signatures. Although Ohman did obtain the requisite signatures by that deadline, the Regional Office has not processed the petition because of the filing of the instant case. The insufficiency of the original petition does not affect the good faith of the Company's actions because the Board's Regional Office docketed the petition and, according to the ALJ, "there is no evidence [that the Company] knew the number of employees who had signed the decertification petition and, based on the face of the petition, [the Company] could have believed that a sufficient number of the approxi-

mately 200 employees, who Petitioner Ohman stated constituted the bargaining unit, had signed the petition, so as to meet the 30–percent requirement for a unit of approximately 576." J.A. at 41.

**2.** The Company also withdrew its offers for units 4 and 5, but the legality of the withdrawal for those units is not in issue because it was resolved by settlement agreement. J.A. at 39 n. 6.

**3.** Section 8(a) makes it an unfair labor practice for an employer "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;" and "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a).

withdraw the union-security and dues-check-off provisions. The ALJ further concluded that the Company's direction to the mediator not to count the ratification ballots was not intended to frustrate bargaining. The Board disagreed and reversed, finding that the Company violated section 8(a)(5) and (1) by "repudiating the agreed-upon ratification procedure" and violated section 8(a)(5) by withdrawing the offer at a time when the ratification procedure "had been substantially completed." J.A. at 48. The Board ordered the Company to cease and desist from its unfair labor practices. The Board also ordered the Company to advise the mediator to count the ratification ballots and ordered that if the ballot-count reveals that the employees ratified the offer, then the parties shall enter into a binding collective-bargaining agreement, and if it reveals that the employees voted against ratification, then the Company shall bargain in good faith with the Union with regard to a new agreement. J.A. at 50–51.

## II.

■ Both Supreme Court dicta and the Board's own precedent establish that an employer is generally permitted to act upon its good-faith doubts regarding a union's majority status by withdrawing a contract offer before it is accepted by the union. *See Auciello Iron Works, Inc. v. NLRB,* — U.S. —, —, 116 S.Ct. 1754, 1759, 135 L.Ed.2d 64 (1996) (assuming without deciding that a company can "act on [its] preacceptance doubts" regarding the union's majority status by "withdraw[ing] its offer to allow it time to investigate while it continue[s] to fulfil its duty to bargain in good faith with the Union"); *Loggins Meat Co.,* 206 NLRB 303, 307–08 (1973) (holding, even in the absence of doubts about the union's majority status, that the employer's withdrawal of a collective bargaining agreement offer after the union voted to accept it but before that acceptance had been communicated did not constitute an unfair labor practice). Therefore, the Board's ruling in this case can be affirmed only if the particular circumstances surrounding the Company's withdrawal establish bad faith or a refusal to bargain. The Board concluded that such circumstances exist here because

the Company repudiated the ratification agreement and because the Company withdrew its offer at a time when the ratification process was substantially complete because all of the ballots had been cast. In both respects, the Board erred. Moreover, no other special circumstances warrant an exception in this case to the general rule that an employer can withdraw an offer at any time prior to acceptance by the union because of its good-faith doubts regarding the union's majority status.

■ There is no support in the record for the Board's conclusion that the Company abrogated the ratification "agreement" by withdrawing the offer and requesting that the mediator not count the ballots. The ratification agreement provided that the ballots would be counted by a mediator "no later than December 7," J.A. at 47, and the stipulation of the parties states that "[i]t was understood by the parties that, if the employees ratified the agreements, in accordance with the Union's ratification procedures, they would enter into a binding contract(s)." J.A. at 47. The Board's own opinion states that the record does not include a copy of the ratification agreement and that the stipulation of facts does not provide additional clarifying information. J.A. at 47. Thus, the record reflects only that the parties agreed to a *procedure* by which the Union could accept the offer, and that the parties agreed to enter into a binding contract *"if the employees ratified the agreements"* according to that procedure. Neither the agreement to have the ballots counted no later than December 7 nor the agreement that the parties would enter a binding contract if the Union did, in fact, accept the offer in any way establishes that the Company bound itself to keep the offer open until the December 7 date. Therefore, the Company did not violate the ratification agreement by withdrawing its offer prior to acceptance.

■ The Board concedes that abrogation of a ratification agreement "generally will not constitute bargaining in bad faith" because ratification is an internal union matter and not a mandatory subject of bargaining. J.A. at 48. Thus, the Board is forced to rely

almost exclusively on its conclusion that the timing of the Company's withdrawal demonstrates bad-faith bargaining. The Company's timing, however, in no way indicates anything other than a reasonable desire to reconsider certain provisions of its offer in light of its good-faith doubts regarding the Union's majority status in unit 3. The Company withdrew its offer prior to the Union's acceptance and on the very day that the decertification petition was filed. The Company even promised to make another offer within ten days. It was the Union that then refused to bargain. The Board's conclusion that the Company withdrew the offer "at a time when the ratification process was essentially complete and all that remained was the counting of the ballots" is not supported by substantial evidence. J.A. at 48. The Board repeatedly stated that the voting was *complete* when the Company withdrew its offer. However, the Company withdrew its offer three days before the deadline for returning the ballots, and, as the Board's counsel conceded at oral argument, there is nothing in the record as to how many of the ballots had actually been cast by that date. Thus, the Company's withdrawal did not "unilaterally preclude[ ] a determination of whether the employees had ratified the contract" at a time when "all that remained was the counting of the ballots." J.A. at 48, 49.

The Board's own precedent in *Loggins Meat Co.*, 206 NLRB 303 (1973), demonstrates that even a withdrawal after a union has voted to accept an offer does not establish bad faith so long as the offer was withdrawn before acceptance was communicated. The only manner in which the Board can even purport to distinguish the case at hand from *Loggins* is on the grounds that here the Company had made a ratification agreement and had selected the December 7 deadline. However, as discussed above, the ratification agreement in no way obligated the Company to keep the offer open until December 7, and therefore cannot provide a basis for distinguishing *Loggins* .

Because an employer is generally permitted to act on its good-faith doubts regarding a union's majority status by withdrawing a collective bargaining agreement offer prior to acceptance by the union, and because there are no special circumstances suggesting bad faith by the company here, the judgment of the Board is reversed and the cross-petition for enforcement of the Board's order is denied.

*REVERSED.*