BARRON, Circuit Judge,
concurring in part and dissenting in part.
I join this excellent opinion in all respects except for the conclusion that the Union has met its burden to show that it did not commit an unfair labor practice in causing Good Samaritan to effect the discharge of one of its employees, Camille Legley. To explain my reasons for dissenting on this issue, it helps to step back from the facts of this case, messy as they are, in order to consider the broader legal context in which it arises, complicated though it is. Doing so reveals, in my view, why we are not in a position to deny enforcement at this stage and why, instead, the proper course is to vacate and remand to the Board for a more fulsome explanation of the grounds for its ruling.
*646 I.
The Board made clear in Wright Line, a Div. of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), that, if an employer discharges an employee, and the Board can make a prima facie showing that the employee’s protected conduct—that is, conduct protected by section 7 of the National Labor Relations Act (“NLRA” or the “Act”), 29 U.S.C. § 157—was a “motivating factor” for the discharge,[18] then the employer will be presumed to have committed an unfair labor practice, under section 8(a)(3) of the Act.[19] Id. at 1089. The Board has also made clear that, in order to rebut that presumption, an employer has the burden of showing that it would have discharged the employee, even in the absence of the employee’s protected conduct, on the basis of a legitimate business reason. Id.
Under Board precedent, it is equally clear that a union that causes an employer to effect the discharge of an employee may be deemed to have committed an unfair labor practice, under section 8(b)(2),[20] if the union did so because of the employee’s section 7-protected activities. For, just like an employer, a union has special power in the workplace. Therefore, a union must show that its reasons for causing the employee’s discharge were not aimed at wrongly leveraging that power by, say, using the union’s ability to cause the employer to take action against an employee who had spoken out against the union because of that speech. The test that the Board uses to determine if the union had an improper motive in causing the employer to discharge an employee is the same Wright Line test that the Board applies to employers. See Freight, Constr., Gen. Drivers, Warehousemen and Helpers, Local Union 287, 257 N.L.R.B. 1255 (1981).
But, significantly for present purposes, the motive-based test set forth in Wright Line is not the only one that the Board has applied to determine whether a union has violated section 8(b)(2) of the Act and thus committed an unfair labor practice by causing an employer to discharge an employee. The Board has also subjected unions—in certain circumstances—to an additional measure of scrutiny beyond that mandated in Wright Line. And here is why.
The Board has recognized that a union, unlike an employer, may have a separate and special obligation—known as its duty of fair representation. Vaca v. Sipes, 386 U.S. 171, 176, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). This duty arises when the union *647 has been designated the “exclusive bargaining representative” of employees in a particular bargaining unit—that is to say, when a union has obtained “statutory authority to represent all members of a designated unit,” not just those within the bargaining unit who have opted to join the union. Id.
Pursuant to that duty, a union must “serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.” Id. Thus, the Board has made clear that, in assessing whether a union, in causing an employer to discharge an employee that the union represents, has committed an unfair labor practice, it is critical to take account of how that union conduct looks in light of what may be a particular union’s special duty of fair representation. Caravan Knight Facilities Mgmt., Inc., 362 N.L.R.B. No. 196, slip op. at 4 & n.10, 2015 WL 5113236 (Aug. 27, 2015).[21]
Deciding just what it would mean to take account of the duty of fair representation in evaluating the conduct of a union in causing an employer to discharge an employee represented by the union is critical to the proper disposition of this case. In fact, it is the way in which the majority treats the Board’s manner of taking account of that duty that causes me to dissent. But, before saying more about why I disagree with the majority in this regard, it first makes sense to turn back to the case at hand to explain how this issue arises here, as the issue concerning the application of the duty-of-fair-representation framework comes to us in a most complicated fashion.
il.
As an initial matter, I am convinced that, in this case, the record supports the Board’s conclusion that the Union did cause the employer to discharge the employee in question, Legley. Thus, the Board quite rightly did evaluate whether the Union’s conduct in having Legley fired constituted an unfair labor practice.
Moreover, while the Board applied the Wright Line test to determine whether the Union committed an unfair labor practice by causing the employer to discharge Leg-ley, I agree with the majority that the Board erred in applying that test. In my view, the record simply does not provide sufficient support for the Board’s conclusion that, under that test, the Union committed an unfair labor practice.
The Board concluded that the Union was motivated by animus against Legley’s protected conduct. But, as the majority describes, the record as a whole does not contain substantial evidence to support that conclusion. The record evidence at most shows that the Union was motivated by Lavigne’s distress at Legley’s disruptive behavior during a meeting in the workplace rather than by Legley’s protected conduct—namely, any arguably anti-union sentiments he expressed at that time. Thus, if Wright Line alone provided the test for assessing whether the Union committed an unfair labor practice, the Board’s ruling against the Union could not be sustained.
But, as the majority acknowledges, the Board did not only apply the Wright Line test in evaluating whether the Union’s conduct in causing the employer to fire Legley constituted an unfair labor practice. The Board also separately evaluated the Un *648 ion’s conduct under the duty-of-fair-representation framework. And, in doing so, the Board determined that, under that framework, too, the record showed that the Union’s conduct amounted to the commission of an unfair labor practice.
In consequence, in order to decide whether the Board’s decision may be affirmed, we must decide whether the record evidence that supports the conclusion that the Union was motivated only by Lavigne’s distress at Legley’s disruptive behavior and not by the Union’s desire to retaliate against Legley for his protected conduct is enough to satisfy the Union’s burden under the duty-of-fair-representation framework, just as it is clearly enough to satisfy the Union’s burden under the Wright Line test. For if such evidence is also enough to satisfy the Union’s burden even under that separate framework, then the Board’s ruling in this case cannot be upheld.
In considering this issue, it is important to note at the outset that there is no question but that the Board was right to undertake the additional scrutiny of the Union’s conduct that is required under the duty-of-fair-representation framework. After all, in this case, the Union did have that special duty of fair representation. It is the exclusive bargaining representative for the bargaining unit that Legley, the discharged employee, joined. And so, under Board precedent, the Board was obliged to take account of that duty in assessing the propriety of the Union’s action in causing Legley’s firing. Nor does the Union contend otherwise.
The question, then, is simply whether the Board properly took account of that special duty of the Union here. The answer to that question depends, at least initially, on understanding how the Board determined that the Union acted improperly in light of its duty of fair representation. Did the Board do so simply by redundantly applying a test that amounted to the motive-based Wright Line test, in which case the Board’s finding of an unfair labor practice could not be affirmed under the duty-of-fair-representation framework any more than it could be affirmed under Wright Line itself? Or, did the Board instead apply a different test that, precisely because of the Union’s special duty of fair representation, focused less on motive and thereby imposed a different burden on the Union to show that it acted properly in causing the employer to discharge Legley? And, if the Board did apply a different test, just what did the Union need to show in order to satisfy it?
The natural place to look to find answers to these questions, of course, is in the Board’s decision in this case. But, because my divergence from the majority on this issue concerns, in large part, the proper reading of the Board’s decision, I think that, before diving in and parsing precisely what the Board said on that score, it helps to keep in mind that, as a matter of policy, the Board might well want the applicable test under,the duty-of-fair-representation framework to be different from the one set forth in Wright Line.
To see why the Board might want that test to be different, consider that it is hardly unusual for employers to decide that an employee must be discharged when there is a good business reason to do so. In light of that fact, one can understand why there might be no reason for the Board to be concerned about the effect that an employer’s discharge of an employee may have on a workplace if the employer can prove that the discharge was motivated by some reason unrelated to the employee’s protected conduct—notwithstanding that the employee had engaged in protected activity under the Act. After all, the Board may not wish to second-guess the employer’s business judgment in firing *649 an employee once it is convinced that the employer acted against that employee for a reason unrelated to employee conduct protected by federal labor law.
In accord with this logic, Wright Line permits an employer to rebut the presumption that it committed an unfair labor practice in firing an employee who had engaged in protected conduct, so long as the employer can show that it acted on the basis of a bona fide reason, unrelated to the employee’s protected conduct, in firing that employee. In other words, under Wright Line, the strength of the employer’s business justification is not independently subject to scrutiny. What matters is simply whether a business justification was the actual justification.
When a union that is subject to the duty of fair representation takes action to cause an employee to be fired by an employer, however, there might be reason for the Board to pursue a distinct line of inquiry into the union’s conduct—and one that is less focused on ferreting out the motive the union had for going after the employee. In the normal course, after all, one might not expect a union to be seeking to fire the workers that it has a special duty to represent fairly. Thus, when a union does engage in the unusual behavior of taking steps to get an employer to fire an employee that the union is obliged to fairly represent, the Board might well be concerned about whether the union’s action constitutes an unfair labor practice, notwithstanding that the union was not motivated by an intent to retaliate for the employee’s protected conduct.
Specifically, the Board might be concerned about the effect on the employees that the union represents of the union’s unusual actions in targeting one of those employees for discharge. The Board might thus require that the union have an especially good reason for seeking the employee’s discharge. Only then, the Board might conclude, would it be clear that the union’s action did not—even if only unintentionally—represent an intimidating and thus impermissible display of union power.
Indeed, the Board explained this reasoning in an early one of its precedents—Int’l Union of Operating Engineers, Local 18, 204 N.L.R.B. 681 (1973)—which the Board has subsequently made clear involved the Board’s application of the duty-of-fair-representation framework to assess whether a union had committed an unfair labor practice in adversely affecting the employment opportunities of those it represented. See Caravan Knight, 362 N.L.R.B. No. 196, slip op. at 4 & n.10. And, in setting forth its reasoning, the Board did adopt a test for determining whether the union committed an unfair labor practice that is quite different from Wright Line.
The Board did so by stating first that, where a union prevents an employee it represents from being hired, or causes the discharge of an employee it represents, that action “encourage[s] union membership on the part of all employees who have perceived that exercise of power,” and thus is presumptively an unfair labor practice. Operating Eng’rs, 204 N.L.R.B. 681. The presumption reflected the Board’s concern that a union’s causing an employer to take an adverse action against an employee that it represents might intimidate other employees into being more supportive of the union than they would otherwise be. The Board then explained that this presumption can be rebutted only by the union showing either that the “interference with employment was pursuant to a valid union-security clause,” or “in instances where the facts show that the union action was necessary to the effective performance of its function of representing its constituency.” Id. (emphasis added).
*650 In other words, the Board did not focus simply—as Wright Line did—on whether the union was motivated by the employee’s protected conduct. Instead, the Board also looked independently at the strength of the union’s interest in acting as it did.
The facts of Operating Engineers are also illuminating, as they reveal how demanding this non-motive-based test is. In that case, an employee had engaged in offensive conduct at the union hiring hall and had acted disruptively in a union meeting. On that basis, the Board found, the union denied him his normal seniority on a hiring hall referral list and thereby prevented him from being hired by the employer. Id But, even though the Board did not dispute that the union took that action in consequence of the disruptive conduct of the employee in union settings and not because of any protected conduct by the employee, the Board still found that the union committed an unfair labor practice. Id.
The Board pointed out that the union had options short of preventing the employee’s hiring to redress the problematic conduct of the employee in union settings, including by imposing internal union discipline in the form of fines or suspensions. Id. at 681-82. Thus, the Board was concerned by the fact that the union, rather than availing itself of these seemingly more proportionate responses tied to the union’s own effective functioning, had instead acted to adversely impact the employment opportunities of the employee— notwithstanding the union’s duty of fair representation. In consequence, the Board stated that the union committed an unfair labor practice because “while the evidence proffered here might indeed show that the Union had no intent to encourage union membership by interfering with Murphy’s employment, yet the display of union power exhibited by an exercise of control over employment opportunity solely for reasons relating to the conduct of an employee as a union member would necessarily have that effect.” Id. at 682 (emphasis in original).
In sum, in Operating Engineers, the Board appeared to reject under the duty-of-fair-representation framework the very kind of showing that the Union makes here with respect to the firing of Legley, and that we agree satisfies the Wright Line test—namely that the Union was motivated to take action against him by his disruptive behavior and not by his protected conduct. For, in Operating Engineers, the Board found the union committed an unfair labor practice in seeking to get the employer to take adverse action against the employee it represented, even though the Board agreed the union was not motivated to take action against the employee by that employee’s protected conduct. And Operating Engineers reached that conclusion because the union’s actions were not necessary to its functioning, and thus had an intimidating effect on the other employees, whom the union was duty-bound to fairly represent.
III.
Against this background, it is no surprise to me that when we turn to the particulars of the Board’s decision in this case regarding its application of the duty-of-fair-representation framework, we do find what seem to me to be strong signals that the Board applied a different test from Wright Line. And, in fact, we find what seem to me to be very strong signals that the Board applied the very test that I have just described the Board as having set forth in Operating Engineers—in other words, a test that zeroes in on the degree to which the union’s action was necessary (or proportionate) to the union’s interest in ensuring its own effective functioning, rather than on whether the union’s action *651 was motivated by a desire to punish the employee for having engaged in protected conduct.[22]
The first of these signals appears in a footnote to the Board’s decision in this case. There, the Board explained that it has in the past “characterized the union’s rebuttal burden under the duty-of-fair-representation framework in different ways.” The Board then set out two formulations. The first formulation was that the union must show that its “action was necessary to the effective performance of its constituency”—a showing about the importance of the union’s interest—for which the Board cited Operating Engineers. The second formulation was that the union must show “the conduct complained of was referable to other considerations, lawful in themselves, and wholly unrelated to the exercise of protected employee rights or other matters with which the Act is concerned,” for which the Board cited Glaziers Local Union 558, 271 N.L.R.B. 583, 585 (1984). And while the Glaziers formulation may sound like one that, like Wright Line, is oriented around the union’s motivation in causing the employer to effect a discharge of the employee, the context of the case reveals the formulation is actually, like Operating Engineers, setting forth a test for scrutinizing the importance of the union’s interest.[23]
Thus, both of these formulations are concerned with the importance of the union’s interest when the union acts to cause the employer to discharge an employee that the union represents. So, the Board clearly seems to understand the test under the duty-of-fair-representation framework to be—whatever its precise content—a distinct one from the motive-based test of Wright Line, a case that, as I noted at the outset, did not even involve a discharge precipitated by the actions of a union that was subject to the duty of fair representation.
The second of these signals appears in the Board’s application of the duty-of-fair-represeritation framework in this case. The Board, in actually evaluating whether the *652 Union met its evidentiary burden' under that framework, stated that the Union “[did] not contend that the discharge [of Legley] was necessary to the effective performance of its function of representing its constituency.” Thus, the Board used the very formulation that Operating Engineers set forth—and not the alternative formulation in Glaziers that the Board had also mentioned in the footnote, which, in any event, was itself a case involving the application of the test set forth in Operating Engineers.
Consistent with my conclusion that the Board in this case applied the “necessary” test from Operating Engineers, the Board’s counsel states in its brief to us that the Board did just that. And, further, the Union never directly disputes that the Board did so.
Thus, it would appear that, as the case comes to us, the Board determined that, in order for the Union to meet its burden under the duty-of-fair-representation framework, the Union had to show that causing Legley’s discharge was “necessary to the effective performance of [the Union’s] function of representing its constituency.” And that conclusion brings us, then, to the question of how the Board actually applied that test.
IV.
Here, the Board applied the “necessary” test from Operating Engineers by ruling against the Union on the ground that the Union failed to meet its burden under that test because the Union made no effort to meet it. Indeed, the Board asserted that, rather than attempting to satisfy that test, the Union instead gave a reason for the employee’s firing that the Board concluded was one that no one disputes showed the Union was motivated by Legley’s protected statements. In other words, according to the Board, the Union merely set forth a reason that would not pass muster even under the motive-focused test of Wright Line.
In light of these aspects of the Board’s decision, one might be forgiven for thinking that the resolution of the issue regarding whether the Union committed an unfair labor practice under the duty-of-fair-representation framework in causing Leg-ley’s discharge is quite straightforward. The Board applied a particular test under the duty-of-fair-representation framework to evaluate the Union’s conduct. The Board then explained that the Union made no effort to meet that test. Case closed.
But, alas, things are not so simple. As it turns out, the Board’s ruling under the Operating Engineers test cannot be upheld on either of the two grounds that the Board offered.
As the majority rightly notes, the Administrative Law Judge did not apply the duty-of-fair-representation framework at all—let alone .the test under that framework set forth in Operating Engineers. Ante at 627-28. The Board thus arguably did not give1 the Union notice that it would need to satisfy the duty-of-fair-representation test as articulated in Operating Engineers. And so, because the Union’s failure to argue to the Board that the test was met is excusable, waiver is no ground for upholding the Board.
The Board is also wrong to have characterized the Union as having been motivated by Legley’s protected conduct. As the majority well explains, the record does not provide substantial evidence to show that the Union was motivated by Legley’s protected conduct rather than by Lavigne’s distress. Because the Board’s characterization of the Union’s reason for discharging Legley is unsupportable, the Board may not rely on that characterization to justify its conclusion that the Union failed to show *653 that its action was necessary to its continued functioning. And thus the Board may not rely on that reasoning to conclude that the Union failed to meet its burden under the distinct Operating Engineers test that the Board seemingly applied.
Nevertheless, the problems with the Board’s reasoning in applying the test from Operating Engineers do not relieve the Union of its obligation to make some argument that it does in fact meet the “necessary” test that Operating Engineers set forth in applying the duty-of-fair-representation framework. And, unless the Union has done so, we have no choice but to sustain the Board’s ruling. We thus come to the final issue: has the Union done so?
V.
As best I can tell, in its briefing to us, the Union does not directly argue that it has satisfied the Operating Engineers test. Rather, it argues only that it has met three other standards for evaluating its conduct—the one described in Wright Line that we have already discussed, as well as two developed by the Board in a pair of cases decided after Operating Engineers but that are nevertheless cast by the Board as tests that, like Operating Engineers and unlike Wright Line, may be deployed to determine whether a union has committed an unfair labor practice in light of its duty of fair representation.
The first of these two formulations of the standard is laid out in Glaziers, 271 N.L.R.B. 583, which, as I have discussed, itself involved an application of the Operating Engineers test, but arguably uses a formulation that emphasizes the need to focus on the union’s motive. The second of these two formulations of the standard is set forth in Caravan Knight, which seems on its face distinguishable from the motive-based one used in Wright Line, even though it perhaps could be read to be a good deal less demanding than the test deployed in Operating Engineers itself. Caravan Knight,' 362 N.L.R.B. No. 196, slip op. at 4 (describing the union’s rebuttal burden as one that requires showing that its actions were “done in good faith, based on rational considerations, and were linked in some way to its need effectively to represent its constituency as a whole”) (emphasis added).[24]
By invoking Wright Line, Glaziers, and Caravan Knight, but not Operating Engineers, the Union’s brief, generously read, does not thereby bypass the only issue that matters—whether the Union has met the test that the Board applied in this case in evaluating the Union’s conduct under the duty-of-fair-representation framework. Rather, by invoking these three Board precedents and eschewing any effort to address Operating Engineers, the Union’s brief appears to be arguing that a union’s rebuttal burden under the duty-of-fair-representation framework is not as different from the one set forth in Wright Line as Operating Engineers would seem to indicate that it is. And, further, the Union’s brief seems to be arguing that, in this very case, the Board understood the test that it applied under the duty-of-fair-representation framework to be more motive-focused, and thus Wright Line-like, than might seem to be the case on a first read of the Board’s decision, given the decision’s use of the “necessary” test that Operating Engineers deployed.
Such an argument draws support, arguably, from the existence of the other formulations of the test that the Board has *654 relied on to determine whether a union has met its rebuttal burden under the duty-of-fair-representation framework—formulations that the Board acknowledges in its opinion in this very case when it notes that it has “characterized the union’s rebuttal burden under the duty-of-fair-representation framework in different ways.” The Union’s argument thus may be understood to proceed that, in light of this jumble of Board precedents on this issue, the seemingly strict “necessary” test from Operating Engineers has been watered down over time such that “necessary” doesn’t really mean “necessary.” In consequence, on this view, this test is, despite Operating Engineers, really focused on the union’s motive in acting rather than on the strength of its interest in acting, as virtually any lawful motive for a union acting as it did that is not based on animus against the employee’s protected conduct would suffice. See Glaziers, 271 N.L.R.B. at 585 (holding that the union need show only that “the conduct complained of was referable to other considerations, lawful in themselves, and wholly unrelated to the exercise of protected employee rights or other matters with which the Act is concerned”); Caravan Knight, 362 N.L.R.B. No. 196, slip op. at 4 (holding that the union need show only that its conduct was “done in good faith, based on rational considerations, and were linked in some way to its need effectively to represent its constituency as a whole”). And so, the Union might fairly be read to be arguing that, under the Board’s precedent, it can win under the duty-of-fair-representation framework the same way it can win under Wright Line: by showing that the Union acted against Legley because Legley was disruptive in the workplace rather than because of any protected conduct in which he engaged.
Insofar as the Union is contending that the test under the duty-of-fair-representation framework that the Board applied in this case—though stated in words that mimic the distinct, strength-of-interest test from Operating Engineers—is in substance a motive-based test like the Wright Line test, I am quite skeptical that the argument has much force. As I have explained, the Board’s reasoning in Operating Engineers indicates that it would have sound reason to inquire not just into a union’s motives, but also the nature and significance of its interest in causing an employee’s discharge. Such a further inquiry would help ensure that the other employees whom the union is duty-bound to represent would not mistake the action taken by the union against that employee for a signal that they need to support the union or risk suffering a similar fate. And, as I have also explained, the Board’s use of Operating Engineers in this case indicates that the Board applied that distinct inquiry.
But, in the end, it is up to the Board to make the call as to whether the test under the duty-of-fair-representation framework is one that focuses on ferreting out the union’s ill motivation or one that focuses on guarding against the potentially unintended intimidating effect of the union’s action by scrutinizing the union’s need to act as it did. Thus, I see no harm in requiring the Board to make that call more clearly in this case than it has, given the somewhat cryptic nature of the Board’s articulation of its reasoning in its decision in this case; the fact that the Union did not have clear notice of its need to engage on this issue below; and the fact that the Board’s precedents in this area, by the Board’s own admission in this case, have used different formulations. There is, after all, good reason to make agencies turn square corners, given the deference that they request from us. And so I see the *655 virtue of making the Board turn them here.
I do not see any good reason, however, for us simply to assume that the Board was applying a test under the duty-of-fair-representation framework that in this case would be more favorable to the Union than the one that the Board applied in Operating Engineers—whether that test is best described by the formulation in Glaziers or Caravan Knight or whether it is, in practical effect, substantively identical to Wright Line. After all, the Board explicitly relied on the language of Operating Engineers in its analysis. Thus, in my view, we should remand to the Board so that it can consider the arguments that (1) the “necessary” test it applied in this case actually means something other than what it meant in Operating Engineers, and (2) the “necessary” test the Board applied here in fact may mean something that is (a) no different from (or, at least, very close to) the test set forth in Wright Line itself or (b) though different, no stricter than the test set forth in Caravan Knight. Cf. 29 U.S.C. § 160(e) (“No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.”); NLRB v. Richards, 265 F.2d 855, 862 (3d Cir. 1959) (remanding to the Board to rule on objection made for the first time to the appeals court, where the petitioner had no opportunity to present the argument earlier). To do otherwise, it seems to me, is to permit the Union to win on the basis of a rule that we have no reason to believe is the right rule in the Board’s judgment. And, that course would permit the Union to win on the basis of a rule that the Board has never applied with the benefit of our explanation as to why its Wright Line analysis fails.
To be sure, the Board, on remand, may explain that it intended to apply a test that is oriented around determining whether the union’s motivation was based on the employee’s protected conduct and thus is one that in substance is the same as the Wright Line test. And, it may do so by concluding that the “necessary” test first set forth in Operating Engineers has come to mean something so different from what it first seemed to mean that it is in effect the Wright Line test. Insofar as the Board chooses that course, then, presumably, the Union will win for the same reason we conclude that it should win under Wright Line.
But, it is also possible that the Board may reaffirm the applicability of the test set forth in Operating Engineers as it was applied in that case—an approach that would ensure that the inquiry under the duty-of-fair-representation framework is not a redundant reprise of the inquiry already required by Wright Line.[25] And, if the Board chooses that course—as the Board’s precedent suggests to me that it will—a remand will still have been useful. On remand, the Board will face a more difficult question in applying that test, as it now knows that it may not rule against the Union under that test on the ground that the Union actually fired Legley for his protected conduct. Thus, the Board will have to decide—as it did not decide the first time around—whether Legley’s disruptive conduct in the workplace provided a sufficient basis for the Union not merely to take some less drastic measure in response but instead to seek to have his employer fire him.
*656 Perhaps the Board would conclude that such a reason passes muster under Operating Engineers. But it is not at all clear to me that, under Board precedent, the Board would do so. In Operating Engineers itself, disruptive employee behavior in union settings was deemed not to be sufficient reason for the union to attempt to get an employee fired. I cannot say with any confidence that the fact that the disruptive conduct here occurred in a workplace setting rather than a union one requires a change in the analysis.
Finally, it is possible that the Board will conclude that Caravan Knight best stated the rule of “necessary” test, which is not as strict as Operating Engineers would make it seem. In Caravan Knight, which was decided after Operating Engineers, the Board required the union to show not only that it has a lawful motivation but also that its interest in causing the discharge is “linked in some way to its need to effectively represent its constituency as a whole.” 362 N.L.R.B. No. 196, slip op. at 4. The Union then won under that test only after the Board determined that the union’s interest was in preventing physical violence by an employee. Id. at 5-6. The facts here dq not appear, however, to rise to that same level. Thus, these facts do not appear—of necessity—to require the Board to reach a similar conclusion in this case.
So, to sum up, I don’t see a basis for simply reversing. Between Caravan Knight—in which the Board held that a union interest stronger than the one at issue here did suffice—and Operating Engineers—in which the Board held that a union interest weaker than the one at issue here did not suffice—we are left without guidance from the Board on what determination it would reach in this case. Only if Wright Line were the test would it be appropriate for us to reverse. But that is the outcome hardest to square with the Board’s opinion in this case.
For these reasons, a remand would not only serve the purpose of forcing the Board to make clear what standard it is applying, but also ensure that the Board has a chance to apply whatever standard it identifies as the right one to the facts of this case. See Manhattan Ctr. Studios, Inc. v. NLRB, 452 F.3d 813, 816 (D.C. Cir. 2006) (“If we conclude that the Board misapplied or deviated from its precedent, we often remand with instructions to remedy the misapplication/deviation.”); see also Regal Knitwear Co. v. NLRB, 324 U.S. 9, 13, 65 S.Ct. 478, 89 L.Ed. 661 (1945) (“Administrative agencies have considerable latitude to shape their remedies within the scope of their statutory authority and, where the infirmity is inadequacy of findings to show appropriateness of the choice made in the particular case, are ordinarily entitled to have the case remanded for further consideration.”).
VI.
I realize that I have addressed this one discrete issue at some length. And I realize, too, that in the end this extended analysis results in what may seem like a rather modest divergence from the position taken by the majority. After all, the distinction between reversing, on the one hand, and vacating and remanding, on the other, may seem like a technical one. And, in a sense, it is:
But, in another sense, it is not, which is why I have thought it important to explain my understanding of what is at issue here in such detail. If the Board has erred in not speaking with the clarity that we should demand of it, the fact remains that the Board has been charged by Congress with the task of administering this statute. See Auciello Iron Works, Inc, v. NLRB, 517 U.S. 781, 787-88, 116 S.Ct. 1754, 135 *657 L.Ed.2d 64 (1996) (noting the “considerable deference that the Board is due by virtue of its charge to develop national labor policy” (citation omitted)). The Board should not be precluded from performing that administrative task.
Just what the Board thinks that task is remains arguably up for debate. For that reason, I have thought it useful to spend some time laying out my own understanding of what the Board’s precedents—somewhat hard to decipher though they are— suggest that the Board believes that task to be. Doing so, I hope, will help ensure that the Board does not engender the kind of confusion in the future in applying the duty-of-fair-representation framework that it has engendered here.
But, insofar as the Board has not made clear what it thinks it must decide in applying that framework, my concern is that, by deciding the matter for ourselves and giving the Board no chance to clear things up, we inevitably substitute our own less informed understanding of labor dynamics for that of the Board. Because I do not believe Congress has given us any warrant to do so, I respectfully dissent.

. Section 7 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.” 29 U.S.C. § 157.

. Section 8(a)(3) provides: "It shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment or any term of condition of employment to encourage or discourage membership in any labor organization.” 29 U.S.C. § 158(a)(3).

.Section 8(b)(2) provides: "It shall be an unfair labor practice for a labor organization or its agents ... to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other, than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.” 29 U.S.C. § 158(b)(2).

. To be clear, the Board in these cases does not charge the union with breaching the duty of fair representation. Rather, the Board sím-ply takes account of the duty of fair representation in determining whether an unfair labor practice was committed.

. I note in this regard that the Board has never held that actions by a union that do not constitute unfair labor practices under the Wright Line test therefore also do not constitute unfair labor practices under the duty-of-fair-representation framework. Rather, the Board has consistently applied the tests in parallel.

. In Glaziers, a union staged a walkout to attempt to get the employer to replace one class of employees, so-called permit workers, with another, journeymen. Glaziers, 271 N.L.R.B. at 586. The Administrative Law Judge applied the very same test set forth in Operating Engineers and determined that the Union did not commit an unfair labor practice under the duty-of-fair-representation framework because it had staged the walkout without any intention to advantage union over non-union workers, even though the journeymen were union members and the permit workers were not. Id. at 596. Rather, the ALJ found, the union had simply sought to enforce a traditional labor practice known as "bumping,” which would give preference in hiring to the more experienced journeymen over the less experienced permit workers, regardless of their union or non-union status. Id. at 596-97. And the ALJ determined that the union’s interest in promoting the traditional hiring practice redounded to the benefit of all the workers represented by the union and thus qualified as an interest sufficiently tied to the union’s effective functioning to satisfy Operating Engineers. Id. The Board then reversed, but not because it found that the union’s true interest in promoting bumping was to favor union members over non-union members. RL at 585-86. Rather, the Board simply determined that the union failed to demonstrate that its interest in promoting bumping was actually one that was "sufficient” to justify the targeted walkout even if was not an interest rooted in the aim of favoring union members because the practice of bumping had "no objective basis” and was not a practice the employer was legally obliged to follow. Id. at 586.

. We note that the Board has not determined whether either of these tests may satisfy the test laid out in Operating Engineers.

. Insofar as adherence to Operating Engineers would mark a change from subsequent formulations articulated by the Board, the Union makes no argument that the Board is barred from making that change.